UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, STATE OF ILLINOIS | )<br>)<br>) |
| Plaintiffs, | )<br>) 11 C 8859 |
| v. | )<br>) Judge George M. Marovich |
| METROPOLITAN WATER RECLAMATION DISTRICT OF GREATER CHICAGO, | )<br>)<br>)<br>) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

On the same day that the United States of America ("US" or the "government") and the State of Illinois ("Illinois") filed suit against the Metropolitan Water Reclamation District of Greater Chicago ("MWRD") for alleged violations of the Clean Water Act, the parties filed a proposed Consent Decree. The deadline for public comments on the proposed Consent Decree has passed, and the US and Illinois are in the process of considering those comments. In the meantime, the Court has received two motions to intervene. The first motion to intervene was filed by two entities, the Alliance for the Great Lakes and the Environmental Law & Policy Center. The second motion to intervene was filed by three entities–the Natural Resources Defense Council, Sierra Club and Prairie Rivers Network–who have a separate suit against MWRD pending in this district.

**I.      Background**

According to the allegations in plaintiffs' complaint (which the Court will accept as true for purposes of this motion), the MWRD is responsible for, among other things, operating and managing storm water and wastewater collection, treatment, discharge and disposal within its

geographical area. That geographical area encompasses 883.6 square miles, and it includes the City of Chicago and about 128 suburban communities. Within that area, the MWRD owns seven water reclamation plants, each of which receives sewage through a system of connecting sewers, and then treats and discharges the water ("combined sewer outfalls"). This case involves three of the water reclamation plants: the Calumet Water Reclamation Plant, which is located in Chicago and discharges into the Little Calumet River; the North Side Water Reclamation Plant, which is located in Skokie and discharges into the North Shore Channel; and the Stickney Water Reclamation Plant, which is located in Cicero and discharges into the Chicago Sanitary and Ship Canal.

For years, the MWRD has occasionally discharged untreated sewage due to the lack of capacity in its collection, treatment and disposal system. The problem is that during periods of heavy rain, the MWRD runs out of capacity to store untreated water and must discharge water before it has been treated. To solve this problem over the long-term, the MWRD has built certain deep tunnels and is working on constructing reservoirs and other improvements (the "Tunnel and Reservoir Plan" or "TARP").

The United States and Illinois filed suit seeking injunctive relief and civil penalties against the MWRD for discharge of pollutants in violation of the Clean Water Act. In Count I, plaintiffs allege that defendant violated § 301 of the Clean Water Act, 33 U.S.C. § 1311, by failing to meet the applicable water-quality standards for dissolved oxygen. Specifically, plaintiffs allege that the MWRD discharged pollutants from the Stickney, North Side and Calumet plants that contributed to violations of the water-quality standards for dissolved oxygen. In Count II, plaintiffs allege that defendant violated § 301 of the Clean Water Act, 33 U.S.C. § 1311, by failing to treat CSO outfalls from the Stickney, North Side and Calumet plants to the extent necessary to prevent the accumulation of sludge deposits, floating debris and solids. In

Count III, plaintiffs allege that defendant failed to comply with certain requirements of discharge permits for the respective plants.

The same day the plaintiffs filed their complaint, the parties filed a proposed Consent Decree, which the parties say resulted from five years of negotiation. Under the proposed Consent Decree, defendant would pay civil penalties of $675,000.00. In addition, the Consent Decree sets out a framework for the MWRD to expand its storage capacity for wastewater and storm water. The plaintiffs allege that the reason for MWRD's unlawful discharges is its lack of storage capacity. The Consent Decree sets deadlines for the completion of reservoirs (part of the MWRD's TARP plan) to expand MWRD's storage capacity. Under the Consent Decree, one reservoir (the Thornton Reservoir, which would provide an additional 3.5 billion gallons of storage capacity) would be completed by December 31, 2015. Another reservoir (the McCook Reservoir, which would provide an additional 10 billion gallons of storage capacity) would be completed by December 31, 2029, with a portion to be completed by the end of 2017. The Consent Decree describes one reason why the deadlines for completing the reservoirs are far off: the MRWD has entered long-term contracts with private mining companies to mine limestone from the holes that will be used as reservoirs. Mining at Thornton Reservoir is 92% complete and is scheduled to be finished by the end of 2013. Mining at McCook Reservoir is 10% complete and is scheduled to be finished by 2028.

Two sets of groups seek to intervene. Each seeks injunctive relief and the chance to argue that the proposed consent decree is not fair, adequate or reasonable.

First, the Alliance for the Great Lakes ("Alliance") and the Environmental Law & Policy Center (the "Policy Center") (together, the "Alliance group") seek to intervene. The Policy Center is a not-for-profit organization whose goals include protecting the Midwest's environment. The Alliance is a non-profit corporation, whose mission includes restoring and

conserving the Great Lakes. Attached to their motion is their proposed complaint in intervention. The three counts in their proposed complaint track the three counts alleged in plaintiffs' complaint. The Alliance and the Policy Center allege that their members have been injured by MWRD's discharge of pollutants. For example, the Alliance alleges that one of its members faced unsightly and foul-smelling sewage while sailing a boat on Lake Michigan in 2010. Another Alliance member can smell sewage from MWRD's CSO discharges after heavy rainstorms. Another Alliance member would like to swim in the Chicago River but does not due to MWRD's discharges. A Policy Center member suffered gastrointestinal illness after her kayak capsized in the Chicago River. As relief, the Alliance and the Policy Center seek civil penalties, injunctive relief, litigation costs and to have their comments about the proposed Consent Decree considered by this Court.

In addition to the allegations in their proposed complaint in intervention, the Alliance and the Policy Group put forth members' affidavits describing their use and enjoyment of the waterways affected by MWRD's alleged discharges. For example, Alliance member William Jefferson Black ("Black") regularly uses Lake Michigan and several beaches (including those at North Avenue and Oak Street) along the lake for recreation. Black has crewed on sailboats, including during the July 2010 Race to Mackinac, during which he observed raw sewage, debris and dead rats that he believes were discharged into the Lake by defendant. On several occasions, Black has been unable to take his family (or to go himself) to the beaches along Lake Michigan due to defendant's untreated discharges. Black intends to continue these activities in or near Lake Michigan in the future. Alliance President Joel Brammeier ("Brammeier") would like to take his children kayaking on the Chicago River, but he is deterred by his fear of the poor water quality and the sight and smell of floating debris discharged by defendant. Alliance member Theodore B. Martin, Jr. ("Martin") lives in Wilmette, Illinois and uses Lake Michigan nearly

every day during the summer to kayak, swim, paddleboard and windsurf. Several times over the last few years, Martin has observed what he describes as "a large brown cloud" spreading through Lake Michigan from Wilmette harbor. Martin states that the "brown cloud" smells like a backed-up toilet, and he believes the "brown cloud" originates from defendant's CSO discharges after large rain storms. When Martin observes these "brown clouds," he avoids recreating in Lake Michigan, but he plans to continue recreating in the Lake Michigan in the future.

Policy Center member Katie Elizabeth Coleman ("Coleman") lives in Oak Park, Illinois but works in Chicago, across the street from the Chicago River. Coleman would like to use the Chicago River for kayaking, but she is reluctant to do so because of the contamination from defendant's untreated CSO discharges into the river. Coleman's kayak once capsized in the Chicago River, where she spent about ten minutes in the water. The next day, she suffered a gastrointestinal illness. Coleman states that if the CSOs were adequately controlled, she would feel safer on the river.

Next, a group including the Natural Resources Defense Council ("NRDC"), the Sierra Club, Inc. ("Sierra Club") and the Prairie Rivers Network ("PRN") (together, the "NRDC group") seeks to intervene. These entities are not-for-profit entities dedicated to the environment. They have attached to their motion a proposed complaint in intervention. Their proposed complaint is sparser than the others, but it seeks to remedy the same allegedly unlawful discharges from MWRD's Stickney, North Side and Calumet plants. They allege that their members are injured by the discharges, because the discharges diminish their members' recreational and aesthetic enjoyment of the affected waterways. As a remedy, this group seeks civil penalties, injunctive relief, attorneys fees and to have the Court reject the proposed Consent Decree.

In addition to the allegations in their proposed complaint in intervention, the NRDC, Sierra Club and PRN have put forth affidavits from their members, in which affidavits the members describe their use and enjoyment of the waterways affected by the discharges. For example, Cynthia Skrukrud ("Dr. Skrukrud"), who has earned a Ph.D. in biochemistry, declares that she is a member of the Sierra Club, the NRDC and PRN. Dr. Skrukrud enjoys canoeing, hiking, and birdwatching. She has boated and hiked on waters that receive discharges from defendant during rainy weather. Dr. Skrukrud is careful when she is near the water, because she is concerned that it may contain untreated sewage and floatables and be depleted of oxygen. She would prefer to recreate in cleaner waters. Declarant Susan Lannin ("Lannin") is a member of the Sierra Club, the NRDC and the PRN. For the last twenty years, Lannin has recreated on the Chicago River, where she kayaks, hikes and canoes. Lannin has observed oily water, floating debris and strong odors while kayaking and canoeing. She would spend more time kayaking and canoeing on the Chicago River if the water were less polluted.

## II. Discussion

### A. Intervention of right

The Alliance group and the NRDC group both argue that they are entitled to intervene as of right pursuant to Rule 24(a)(1). The defendant argues that they should not be allowed to intervene. The plaintiffs make no legal argument as to why intervenors should not be allowed to intervene.[1]

Pursuant to Rule 24(a)(1) of the Federal Rules of Civil Procedure, "the court must permit anyone to intervene who: (1) is given an unconditional right to intervene by a federal statute[.]"

---

[1] To be precise, the United States and the State of Illinois say that they do not object to intervention so long as the court limits the intervenors' participation. This is not a negotiation. The governments have waived any arguments against intervention by not making them.

Fed.R.Civ.P. 24(a)(1). The Alliance group and the NRDC group argue that the Clean Water Act gives them an unconditional right to intervene. The Court agrees.

Section 505(a)(1) of the Clean Water Act, 33 U.S.C. § 1365(a)(1), provides any "citizen" (which § 1365(g) defines as a person "having an interest which is or may be adversely affected") a private right of action against any person "alleged to be in violation of (A) an effluent standard or limitation[.]" 33 U.S.C. § 1365(a)(1). The private right is taken away, however:

> if the Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States, or a State to require compliance with the standard, limitation, or order, *but in any such action in a court of the United States any citizen may intervene as a matter of right*.

33 U.S.C. § 1365(b)(1)(B) (emphasis added). It is the highlighted language that the purported intervenors cite as granting them an unconditional right to intervene.

Defendant makes two arguments in opposition to the motions to intervene as of right. First, defendant argues that statutory intervention requires allegations of violations of effluent standards. This argument has some merit, because the private right of action is a right to allege violations of "an effluent standard or limitation." 33 U.S.C. § 1365(a)(2). This argument does defendant no good, however, because the statute goes on to define "effluent standard or limitation" as including half a dozen things, among them "a permit or condition thereof issued under section 1342 of this title[.]" 33 U.S.C. § 1365(f). Plaintiffs specifically allege that defendant has violated permits issued under § 1342 and so do the proposed intervenors. The intervenors, thus, have alleged violations of effluent standards and are entitled to intervene pursuant to statute.

Defendant also argues that the parties seeking to intervene lack standing to sue. The minimum standing requirements are: (1) an injury in fact; (2) a causal connection between the

injury and the conduct complained of; and (3) a likelihood that the injury would be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). An "injury in fact" is "an invasion of a legally protected interest" which is both "concrete and particularized" and "actual or imminent." *Lujan*, 504 U.S. at 560. The "party invoking federal jurisdiction bears the burden of establishing these elements with the manner and degree of evidence required at the successive stages of the litigation." *Id*. at 561.

     Here, the intervenors have standing. Each group has put forth evidence of their members' injuries and have alleged that the injuries were caused by defendant's untreated CSO discharges. For example, the Alliance group put forth evidence that Martin uses Lake Michigan almost every day for water sports. While using Lake Michigan, Martin has observed what he calls a "brown cloud" that smells like a backed-up toilet. Martin avoids recreating in Lake Michigan when he observes such a brown cloud, which he alleges is caused by defendant's CSO discharges. Martin plans to continue recreating in the lake in the future. Similarly, the Alliance group put forth evidence that member Coleman was sickened by contamination she believes is from defendant's CSO discharges when her kayak capsized in the Chicago River. Coleman would kayak on the Chicago River more if the CSOs were controlled. The NRDC group has put forth evidence that Lannin has been kayaking, canoeing and hiking along the Chicago River for twenty years. Lannin is concerned about contamination from defendant's CSO outfalls and has observed strong odors and floating debris while kayaking. Lannin would spend more time kayaking if the Chicago River were less polluted. In addition to alleging that their injuries are caused by defendant, the proposed intervenors have also shown that the requested relief would redress their injuries. These intervenors seek, among other things, injunctive relief against

further discharges, and they say they would use and enjoy the water more if the water were cleaner.

Defendant argues that the intervenors' injuries are speculative. Specifically, defendant argues that the intervenors want to change the consent decree and that until the consent decree is entered, such an injury is speculative. The Court disagrees. The intervenors' injuries are not caused by the consent decree. The intervenors allege that their injuries are caused by the defendant's untreated discharges into the Chicago River and Lake Michigan. The alleged injuries have occurred and are continuing to occur. The injuries are not speculative.

Defendant also argues that the relief intervenors seek will not redress their injuries. Among other things, intervenors want the reservoirs completed more expeditiously than the reservoirs would be completed under the time-line set out in the proposed consent decree. Defendant argues that there is no difference to the intervenors whether the tunnels are completed in 2029 or slightly sooner. As the Seventh Circuit has said, to have standing, a claimant "need not show that a favorable decision will relieve her every injury." *Sierra Club v. Franklin*, 546 F.3d 918, 928 (7th Cir. 2008). In any case, intervenors also seek injunctive relief, which would redress their injuries.

Intervenors are entitled to intervene under Rule 24(a)(1).

### B. Permissive intervention

Even if intervention were not appropriate under Rule 24(a)(1), the Court would allow the Alliance group and the NRDC group to intervene under Rule 24(b). Under Rule 24(b), a "court may permit anyone to intervene who: . . . (B) has a claim or defense that shares with the main action a common question of law or fact." Fed.R.Civ.P. 24(b)(1)(B).

It is clear that the two proposed complaints in intervention share common issues of law and fact with the plaintiffs' claims against defendant. The three counts in the Alliance group's proposed complaint track the three counts in the plaintiffs' complaint and are based on the same facts and law. The NRDC's proposed complaint, while sparser, seeks to remedy the same alleged violations as plaintiffs' complaint and is based on the same law and facts.

Thus, the Court would permit the Alliance group and the NRDC group to intervene in this case even if they were not entitled to intervention by right.

### C. Scope of intervention

The parties disagree on the appropriate scope of intervention. The Court need not decide the scope of intervention at this point.

At this point, the governments are considering the public comments they received after filing the proposed consent decree. At some point, the governments may file a motion asking the Court to enter the proposed consent decree (or a version thereof). At a minimum, the intervenors may file briefs in support or opposition to any motion to enter a consent decree. (The governments and the intervenors agree that this should be allowed.) If the intervenors want additional involvement in the case once the governments have filed their motion to enter a consent decree, they may seek the Court's permission at that time.

## III. Conclusion

For the reasons set forth above, the Court grants the Alliance group's motion [17] to intervene and grants the NRDC group's motion [14] to intervene.

ENTER:

_____
George M. Marovich
United States District Judge

DATED: August 7, 2012