**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| STATE OF ILLINOIS, | ) | |
| | ) | Case No. 1:11-cv-08859 |
| Plaintiffs, | ) | |
| | ) | Hon. George M. Marovich |
| NATURAL RESOURCES DEFENSE | ) | |
| COUNCIL, INC., et al., | ) | |
| | ) | |
| | ) | |
| Plaintiff-Intervenors, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| METROPOLITAN WATER | ) | |
| RECLAMATION DISTRICT OF | ) | |
| GREATER CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF UNITED STATES' AND
STATE OF ILLINOIS' MOTION TO ENTER CONSENT DECREE**

**TABLE OF CONTENTS**

I.   INTRODUCTION ............................................................................................... 1

II.  STATEMENT OF THE ISSUE........................................................................ 3

III. BACKGROUND ............................................................................................... 4

    A.   The Clean Water Act Regulatory Scheme, the Wet Weather Water
        Quality Act and EPA's 1994 Combined Sewer Overflow Policy............................. 4

    B.   Development, Construction, and Implementation of TARP ...................... 7

        1.   Description of TARP ........................................................................ 7

        2.   TARP Reservoirs Are Congressionally Authorized Corps
            Projects ............................................................................................ 10

        3.   TARP Was Partially Constructed and in Operation Prior
            to Issuance of the CSO Policy ........................................................ 12

IV.  THE PROPOSED CONSENT DECREE ...................................................... 13

V.   SUMMARY OF PUBLIC COMMENTS RECEIVED ON THE
    CONSENT DECREE ..................................................................................... 15

VI.  THE CONSENT DECREE SHOULD BE APPROVED BECAUSE IT IS FAIR,
    REASONABLE, CONSISTENT WITH THE CWA, AND IN THE PUBLIC
    INTEREST ..................................................................................................... 16

    A.   Standard of Review ................................................................................... 16

    B.   The Consent Decree is Procedurally and Substantively Fair
        Because It Remedies the Violations Alleged in the Complaint and
        Holds MWRD Accountable for Its Past Violations ................................. 18

        1.   The Consent Decree is Procedurally Fair ......................................... 19

        2.   The Consent Decree is Substantively Fair ........................................ 21

    C.   The Proposed Consent Decree is Reasonable and Adequate,
        Because it Contains Rigorous and Detailed Compliance
        Requirements and the Schedule for Completion of TARP
        is Enforceable and as Expeditious as Practicable .................................... 24

1.  Given the Massive Size of the McCook Reservoir,
    Its Completion Schedule is Reasonable and Appropriate ................................... 27

2.  Commercial Mining of Quarries at the Market Rate is Efficient
    and Part of the Approved LTCP and Authorized Corps Project ........................ 30

3.  Vulcan is in a Uniquely Favorable Position to Mine the
    McCook Reservoir Expeditiously ...................................................................... 30

4.  The Alternative Mining Methods Suggested by Commenters,
    Such as Stockpiling, Would Raise Significant Environmental
    and Feasibility Concerns and Waste a Very Valuable
    Natural Resource ................................................................................................ 32

5.  Mining Without Regard to Market Conditions Would Not
    Increase the Demand for Stone ......................................................................... 35

6.  The Contingency Provisions of the Decree Appropriately Address
    the Potential for Delays in the Schedule for Completion of TARP ................... 37

D.  The Green Infrastructure Program That Serves as a Supplement to
    TARP is Reasonable and Adequate .................................................................... 38

E.  The Decree Sufficiently and Appropriately Addresses the
    Violations Alleged in the Complaint .................................................................... 41

F.  The Consent Decree is in the Public Interest and Consistent
    With the Objectives of the CWA .......................................................................... 42

VII.  CONCLUSION .......................................................................................................... 47

## TABLE OF AUTHORITIES

### FEDERAL CASES

*American Canoe Association, Inc. v. United States Environmental Prot. Agency*,
    54 F. Supp. 2d 621 (E.D. Va. 1999) .................................................................. 17

*Bragg v. Robertson*,
    54 F. Supp. 2d 653, 660 (S.D. W.Va. 1999)…………………………………….........17

*EEOC v. Hiram Walker & Sons, Inc.*,
    768 F.2d 884 (7th Cir. 1985) .......................................................................... 17

*In re Tutu Water Wells CERCLA Litigation*,
    326 F.3d 201 (3d Cir. 2003) ........................................................................... 19

*Kelley v. Thomas Solvent Co.*,
    717 F. Supp. 507 (W.D. Mich. 1989) .............................................................. 18

*Securities and Exchange Commission v. Citigroup Global Markets Inc.*,
    673 F.3d 158 (2nd Cir. 2012) ................................................................... 42, 45

*United States v. Akzo Coatings of America, Inc.*,
    949 F.2d 1409 (6th Cir. 1991) ............................................................ 16, 18, 24

*United States v. Associated Milk Producers, Inc.*,
    534 F.2d 113 (8th Cir. 1976) .......................................................................... 18

*United States v. Cannons Engineering*,
    899 F.2d 79 (lst Cir. 1990) ................................................... 17, 18, 21, 24, 25

*United States v. Comunidades Unidas Contra La Contaminacion*,
    204 F.3d 275 (1st Cir. 2000) ............................................... 19, 21, 24, 25

*United States v. Davis*,
    261 F.3d 1 (1st Cir. 2001) ...................................................................... 16, 18, 21

*United States v. District of Columbia*,
    933 F. Supp. 42 (D.D.C. 1996) ................................................. 17, 23, 25, 28, 41

*United States v. Fort James Operating Co.*,
    313 F. Supp. 2d 902 (E.D. Wis. 2004) ..................................................... 17, 18

*United States v. George A. Whiting Paper Co.*,
    644 F.3d 368 (7th Cir. 2011) .................................................................... 17, 18, 21

iv

*United States v. Microsoft Corp.,*
    56 F.3d 1448, 1462 (D.C. Cir. 1995)……………………………………………………41, 42

*United States v. Oregon*,
    913 F.2d 576 (9th Cir. 1990) ........................................................................... 19

*United States v. Seymour Recycling Corp.*,
    554 F. Supp. 1334 (S.D. Ind. 1982)…………………………………………………….25

*United States v. Town of Moreau, New York*,
    979 F. Supp. 129 (N.D.N.Y. 1997) ................................................................... 20

*United States v. Wallace*,
    893 F. Supp. 627 (N.D. Tex. 1995) .................................................................. 18

## FEDERAL STATUTES

33 U.S.C. § 1251 *et seq.* ............................................................................................ 1

33 U.S.C. § 1251(a) ........................................................................................... 4, 42

33 U.S.C. § 1311(a) ................................................................................................. 4

33 U.S.C. § 1318 ................................................................................................... 20

33 U.S.C. § 1319(b) and (d) .................................................................................... 4

33 U.S.C. § 1342 ..................................................................................................... 4

33 U.S.C. § 1342(q)(1) ............................................................................................ 6

33 U.S.C. § 1362 …………………………………………………………………………………4

33 U.S.C. § 1365 ..................................................................................................... 4

Pub. L. No. 99-662 ................................................................................................ 10

Pub. L. No. 100-676 .............................................................................................. 10

Pub. L. No. 106-554 ................................................................................................ 6

## FEDERAL REGULATIONS

28 C.F.R. § 50.7 ...................................................................................................... 2

59 Fed. Reg. 18,688 (April 19, 1994) ............................................................................. 6

59 Fed. Reg. 18,689 ……………………………………………………………..6, 42

59 Fed. Reg. at 18,690 ……………………………………………………………12, 42

59 Fed. Reg. at 18,691-94……………………………………………………………6

76 Fed. Reg. 79,710 (Dec. 22, 2011) ............................................................................. 2

77 Fed. Reg. 2319 (Jan. 17, 2012) ............................................................................. 2

**STATE STATUTES**

415 ILCS 5/12(f) (2012) ............................................................................. 4

## I.  INTRODUCTION

The United States, on behalf of the U.S. Environmental Protection Agency ("EPA") and the State of Illinois ("State"), on behalf of Illinois EPA ("Illinois EPA") (collectively the "Governments"), having carefully considered the public comments received on the proposed Consent Decree ("Consent Decree" or "Decree") that was lodged with the Court on December 14, 2011, jointly request the Court to approve and enter the Consent Decree as a judgment in this Clean Water Act action against the Metropolitan Water Reclamation District of Greater Chicago ("MWRD").

This Consent Decree would resolve the claims in the Governments' joint Complaint, filed simultaneously with the lodging of the Consent Decree, which alleges that discharges of untreated sewage mixed with stormwater through combined sewer overflows ("CSOs") in MWRD's sewer system violate the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq.*, and certain requirements of the National Pollutant Discharge Elimination System permits issued to MWRD by Illinois EPA.  The Complaint alleges that MWRD's CSO discharges have violated provisions of its CWA permits that prohibit the discharge of pollutants into waters of the United States that cause or contribute to violations of applicable water quality standards for dissolved oxygen, solids, and floatables.  (*See* Complaint ¶¶ 48-59, Dkt. No. 1).  The United States also alleges that MWRD has violated the requirement of its CWA permits that prohibits CSO discharges without first providing the equivalent of primary treatment for at least ten times the average dry weather flow for the design year.  (*See Id.* at ¶¶ 60-69).

To remedy these alleged violations, the Consent Decree requires MWRD to implement a comprehensive program to capture high flows in its combined sewers after precipitation, and store the wastewater until it can be treated in MWRD's water reclamation

1

plants. The centerpiece of this remedial program is to put MWRD on an enforceable schedule for completion of the partially implemented Tunnel and Reservoir Plan ("TARP"), MWRD's plan approved pursuant to the CWA for abating CSOs, part of which is also a longstanding Army Corps of Engineers major public works project. (Consent Decree Section VI, Dkt. No. 3-1). The Consent Decree also requires MWRD to perform extensive post construction compliance monitoring following completion of TARP; implement enforceable measures to control floatables in response to rain events that cause CSO discharges; pay a civil penalty of $675,000; and perform a wide ranging "green infrastructure" program consisting of measures such as permeable pavement and rain gardens. As described in more detail below in Section VI.B, lodging the proposed Consent Decree culminated a years-long process of extensive fact-finding, settlement discussions, and independent agency evaluation of the case.

At the time of lodging the proposed Consent Decree, the Governments asked the Court to defer action on it while the United States submitted the proposed settlement to public review and comment as provided in 28 C.F.R. § 50.7. (Notice of Lodging of Consent Decree 2, Dkt. No. 3). Notice of the proposed Consent Decree was published in the *Federal Register* on December 22, 2011, inviting the public to comment for a period of thirty days. (76 Fed. Reg. 79,710 (Dec. 22, 2011)). In response to requests by various citizen groups for a sixty-day extension to the comment period, the United States extended the comment period until March 21, 2012.[1] (77 Fed. Reg. 2319 (Jan. 17, 2012)). Some of the citizen groups sought permission to intervene in this case (the "Plaintiff-Intervenors") and to seek discovery. (Dkts.

---

[1] The January 3, 2012 request for extension of the public comment period was submitted by Plaintiff-Intervenors the Alliance for the Great Lakes ("Alliance"), the Environmental Law & Policy Center ("ELPC"), Natural Resources Defense Council, Inc. ("NRDC"), and the Prairie Rivers Network ("PRN"), as well as the Center for Neighborhood Technology, Friends of the Chicago River, Openlands and the Sierra Club – Illinois Chapter. The Sierra Club, Inc. ("Sierra Club") has intervened in this action.

No. 48, No. 49). By order dated August 7, 2012, the Court granted the Plaintiff-Intervenors' motions to intervene, but deferred ruling on their request for discovery.[2] (Dkt. No. 47).

The United States received ten sets of public comments on the Consent Decree, including lengthy comments from the Plaintiff-Intervenors. The comments raise numerous issues which the United States, in consultation with the State, has carefully considered and addresses in detail in the attached Responsiveness Summary and the supporting declarations of the experts with whom the Governments consulted, including a research geologist specializing in aggregate resources and a mineral resources economist. The Governments continue to believe that this proposed settlement is fair, reasonable, consistent with the CWA, and in the public interest, and they therefore seek entry of the proposed Consent Decree by this Court.

## II.  STATEMENT OF THE ISSUE

Whether, given the policies favoring settlements and the deference that should be given to the Government's technical expertise and enforcement discretion, the proposed Consent Decree is fair, reasonable, consistent with the CWA, and protective of the public interest.

---

[2] The Governments asked that the Court limit the scope of intervention to: (1) filing legal briefs in response to a motion to enter the proposed Consent Decree, should the Governments seek to enter the proposed Decree; and (2) filing an appeal should the Consent Decree be entered by the Court. Such limitations would sufficiently protect the Plaintiff-Intervenors' asserted interests, while preserving the strong policy in favor of settlements. (Response by United States and State of Illinois to Motions to Intervene by Intervenor Plaintiffs at 2, Dkt. No. 42). The Court granted the motions to intervene, allowing Plaintiff-Intervenors to file briefs in support of or opposition to a motion to enter the consent decree, but requiring them to seek the Court's permission for any additional involvement. (Memorandum and Order at 10, Dkt. #47).

## III. BACKGROUND

A. The CWA Regulatory Scheme, the Wet Weather Quality Act and EPA's 1994
   Combined Sewer Overflow Policy

The CWA makes it unlawful for any person to discharge any pollutant from a point
source into waters of the United States except, as pertinent to this case, in compliance with a
National Pollutant Discharge Elimination System ("NPDES") permit issued by EPA or an
authorized state. (33 U.S.C. §§ 1251(a), 1311(a), 1342, and 1362). Similarly, Illinois' water
pollution control statute makes it unlawful for any person to discharge pollutants to waters of
the State without an NPDES permit. (415 Ill. Comp. Stat. 5/12(f) (2012)). An NPDES permit
typically contains limitations on the amounts and types of pollutants that may be discharged
(*i.e.*, effluent limitations), and requirements for monitoring and reporting of discharges.
Illinois EPA has been authorized by EPA to administer the NPDES permit program in
Illinois. As is true in many states, NPDES permits issued by Illinois EPA implement both the
CWA and comparable provisions of Illinois law.

Pursuant to CWA Section 309(b) and (d), 33 U.S.C. § 1319(b) and (d), the United
States may enforce state-issued NPDES permits, as well as those issued by EPA, through civil
actions for injunctive relief and civil penalties. States may also enforce NPDES permits either
through the citizen suit provision of the CWA, 33 U.S.C. § 1365, or under state law. In this
case, the State joined the United States in enforcing the CWA and MWRD's NPDES permits.
Both Governments have signed the Consent Decree and fully support its entry by the Court.

In addition to the general CWA provisions described above, Congress has provided more specific direction to EPA regarding CSOs.  As is the case with many other communities, a significant portion of MWRD's service area includes the City of Chicago and other (satellite) municipalities with combined sewers that are connected to MWRD's collection system.  Combined sewers are designed to collect storm water runoff, domestic sewage, and industrial wastewater in the same pipe and transport it to a sewage treatment plant, where it is treated before discharge to a water body.  Nationally, combined sewer systems serve roughly 772 communities, mostly in the Eastern and Midwestern areas of the country.[3]

During dry weather, local municipalities within MWRD's service area collect and convey wastewater including sanitary sewage through local sewer systems to MWRD "interceptor" sewer lines, which transport the wastewater to MWRD's water reclamation plants ("WRPs") for treatment.  During periods of heavy rainfall or snowmelt, however, the wastewater volume in a combined sewer system can exceed the capacity of the sewer system or treatment plant.  For this reason, combined sewer systems are designed to overflow occasionally, as combined sewer overflows or CSOs, and discharge excess wastewater directly to nearby water bodies before the combined sewer flows reach a treatment plant.[4] Although MWRD has reduced its CSO discharges through its partial implementation of TARP, substantial CSO discharges continue to occur from portions of MWRD's or satellite communities' outfalls during and immediately following some rain events.

In 1994, EPA issued its CSO Policy as "a comprehensive national strategy to ensure that municipalities, permitting authorities, water quality standards authorities and the public

[3] *See Combined Sewer Overflows, Demographics,* http://cfpub.epa.gov/npdes/cso/demo.cfm (last visited April 23, 2013).

[4] *See Combined Sewer Overflows, Overview,* http://cfpub.epa.gov/npdes/home.cfm?program_id=5 (last visited April 23, 2013).

engage in a comprehensive and coordinated planning effort to achieve cost effective CSO controls that ultimately meet appropriate health and environmental objectives." (59 Fed. Reg. 18,688 (April 19, 1994)). The CSO Policy is intended to provide guidance to communities that have combined sewer systems as well as state NPDES and water quality standards authorities on the "planning, selection, and implementation of CSO controls that meet the requirements of the CWA." (*Id*.). The CWA does not categorically prohibit all CSOs. Instead, the CSO Policy recognizes that CSOs are site specific in nature and therefore provides the necessary flexibility to tailor controls to local situations. (*Id*.).[5]

On December 21, 2000, Congress added a provision to the CWA that explicitly endorses EPA's CSO Policy in permits, orders, and judicial consent decrees. That provision is known as the "Wet Weather Water Quality Act of 2000," Pub. L. No. 106-554, § 112, (2000), and is found at Section 402(q)(1) of the CWA, 33 U.S.C. § 1342(q)(1). The Wet Weather Water Quality Act provides that:

> Each permit, order, or decree issued pursuant to [the CWA] . . . for a discharge from a municipal combined storm and sanitary sewer shall conform to the Combined Sewer Overflow Control Policy ["CSO Policy"] signed by the Administrator on April 11, 1994 . . . .

(33 U.S.C. § 1342(q)(1)). The primary mechanism specified in the CSO Policy for implementing these principles is the multi-step process of developing and implementing a "Long Term Control Plan" ("LTCP") to determine the long-term remedial measures necessary for a community's CSOs to come into compliance with the CWA "as soon as practicable." (*See* 59 Fed. Reg. at 18,688, 18,691-94).

---

[5] The CWA does, however, prohibit all dry weather CSOs. (*See* 59 Fed. Reg. 18,689). Because all dry weather CSOs are prohibited, the CSO Policy does not apply to dry weather CSOs. (*Id*.). Dry weather CSOs are not at issue in this case.

6

B.  Development, Construction, and Implementation of TARP

The proposed Consent Decree would require MWRD to complete implementation of its approved LTCP, now known as TARP, to address CSOs and come into compliance with the CWA.  Not only is TARP MWRD's approved LTCP, but it is unique among CSO LTCPs in that it is also part of a longstanding Army Corps of Engineers ("Corps") public works project authorized by Congress.  As directed by Congress, the Corps is responsible for certain flood damage reduction aspects of TARP, including the McCook Reservoir project, one of three massive reservoirs in the TARP system.  Although the Consent Decree is prospective in nature, this Section of the memorandum nonetheless provides the background and a brief history of TARP, as two of the public comments focused on the history of TARP's construction, as well as the schedule for completing TARP required under the proposed Consent Decree.

1.  Description of TARP

The origins of the McCook Reservoir and TARP overall date back to the 1970s. After evaluating numerous alternatives, TARP was adopted in 1972 by the Flood Control Coordinating Committee, consisting of representatives of MWRD (then MSDGC),[6] Chicago, Cook County and the State of Illinois, as a regional approach to reduce the flooding and pollution associated with the combined sewer system of Chicago and dozens of other satellite communities within the MWRD service area.  (Consent Decree at 1).  The main objectives of TARP are to reduce CSOs, backflows to Lake Michigan and basement flooding.  (Consent Decree App. A, at 2, Description of TARP, Dkt. No. 3-2; Ex. 3, Declaration of Michael Padilla ("Padilla Decl.") ¶ 8).

_____

[6] The Metropolitan Sanitary District of Greater Chicago, as MWRD was formerly known.

TARP is designed to capture and store combined sewer flows, which otherwise would become CSOs, in tunnels and reservoirs until such flows can be pumped to existing treatment plants for full secondary treatment prior to discharge to local waterways. (Consent Decree App. A, at 2). TARP includes three major features: (1) the near surface collector and drop shaft systems that are connected to (2) underground conveyance tunnels that are in turn connected to (3) three storage reservoirs that will be dewatered through three of MWRD's WRPs. (Ex. 3, Padilla Decl. ¶ 9; Consent Decree App. A, at 2).

TARP consists of four tunnel systems and three massive reservoirs. MWRD commenced construction of the tunnel portions of TARP in 1975, and has continued construction since then with some tunnels coming on line beginning as early as 1980. (Consent Decree at 2). Substantially all of the planned tunnels (about 109 miles in total, with a design storage capacity of approximately 2.3 billion gallons) have now been completed along with the first of three planned reservoirs - the Gloria Majewski Reservoir (formerly known as the O'Hare Reservoir) completed in 1998 with approximately 350 million gallons of storage capacity. (Consent Decree at 2-3). Currently, when the TARP tunnels reach capacity, excess flows then discharge through the CSO outfalls to local waterways. (Ex. 3, Padilla Decl. ¶ 9).

The remaining work for TARP centers on completion of two enormous reservoirs currently under construction that will be connected to three tunnel systems: (1) the Thornton Composite Reservoir, which will provide an additional storage capacity of approximately 4.8 billion gallons for the Calumet TARP system;[7] and (2) the McCook Reservoir, which will

---

[7] The Thornton Transitional Reservoir currently has a 3.1 billion gallon storage capacity for floodwater from Thorn Creek. Upon completion of the Thornton Composite Reservoir, with the additional 4.8 billion gallon

provide a further capacity of approximately 10 billion gallons for the Mainstream and Lower Des Plaines TARP systems. (*Id.* at ¶ 10; Consent Decree ¶¶ 16, 17).

Under the schedule set forth in the proposed Consent Decree, the Thornton Composite Reservoir is scheduled to be completed by December 31, 2015. The McCook Reservoir will consist of two stages. Stage 1 of the McCook Reservoir is scheduled to be completed by December 31, 2017, with a design storage capacity of 3.5 billion gallons. Stage 1 of the McCook Reservoir is approximately fifty percent mined and upon completion will be operational while work continues on Stage 2. Stage 2 of the McCook Reservoir is scheduled to be completed by December 31, 2029, with a design storage capacity of 6.5 billion gallons. Thus, by 2017, MWRD will have added 8.3 billion gallons of storage capacity to TARP, more than quadrupling TARP's current storage capacity. (Ex. 3, Padilla Decl. ¶ 10). Upon completion, the McCook Reservoir will be the largest reservoir for storage of combined sanitary flows and stormwater in the country. (*Id.* at ¶ 12).

Over $3 billion has been spent on TARP thus far since the mid-1970s ($1.4 billion by MWRD and the remainder obtained through the EPA Construction Grants Program and the Corps). [8] In 2012 dollars, MWRD estimates the total amount spent as $9.8 billion, with $4.3 billion of that from MWRD. Completion of construction of the Thornton Composite and McCook Reservoirs is expected to cost an additional $350 million. [9]

---

storage capacity for flows from TARP, the total storage capacity of the Thornton Composite Reservoir will be approximately 7.9 billion gallons. (*See* Consent Decree App. A, at 11, 13.)

[8] EPA provided partial funding for construction of TARP's tunnels, but not the reservoirs. (Consent Decree App. A, at 1).

[9] This was MWRD's best estimate of costs to complete TARP as of May 2013.

2.  <u>TARP Reservoirs Are Congressionally Authorized Corps Projects</u>

In the mid-1970s, Congress directed the Corps to study alternative flood reduction measures to identify the most cost effective solution and determine the appropriate federal interest in supporting the water pollution and flood control aspects of TARP.  To that end, the Corps has conducted a variety of detailed studies addressing, *inter alia*, the feasibility, design and cost effectiveness of alternative measures for implementing TARP, which led to the reservoir portion of TARP being designated as a Corps flood control project.  (Ex. 3, Padilla Decl. ¶ 13).  (*See also* Water Resources Development Act of 1988, Pub. L. No. 100-676, 102 Stat. 4012, 4013 (1988)).

As a Congressionally authorized Corps project, the reservoirs are eligible for federal funding and the Corps is directly responsible for the design and construction of the reservoirs, with MWRD as the local sponsor responsible for providing the rough hole for the reservoir. (Ex. 3, Padilla Decl. ¶ 9; Consent Decree at 2).  (*See generally* Section 103 of Water Resources Development Act of 1986, Pub. L. 99-662, 100 Stat. 4082, 4084-87 (1986)).  Due to the enormous volume in storage capacity needed for each of the reservoirs, the Corps recommended two large quarries as the locations for the rough holes for the remaining reservoirs – the Thornton quarry for the Thornton Composite Reservoir and the McCook quarry for the McCook Reservoir.  The McCook quarry is owned by Vulcan Materials, Inc. ("Vulcan").

Congress subsequently directed the Corps to reevaluate the location of the McCook Reservoir project in view of its potential impacts on Vulcan's operations at its McCook quarry and the loss of valuable natural resources that would result from converting this active quarry containing hundreds of million tons of limestone into a reservoir.  (Ex. 3, Padilla Decl.

10

¶ 20).  The location for the McCook Reservoir ultimately selected by the Corps and approved

by the Assistant Secretary of the Army in 1999, pursuant to Congressionally-delegated

authority, is in a portion of MWRD-owned land located nearly adjacent to the Vulcan quarry.

By selecting this location, the Corps addressed concerns raised by Congress regarding

Vulcan's quarry, because it preserved a natural resource by allowing the McCook quarry to

remain in business, as opposed to being condemned and thereby losing the opportunity to put

the remaining limestone reserves to a productive use.  (*Id.* at ¶ 27).

Following selection of a location for the McCook Reservoir project, the Corps

proceeded with design and construction of the reservoir.  Section 221 of the Flood Control

Act of 1970 requires that the Corps enter into a written project cooperation agreement with

the non-federal sponsor – in this case MWRD – before beginning construction of that project.

After the requisite project cooperation agreement was executed by the Corps and MWRD in

1999, construction activities commenced at the McCook Reservoir site and have continued

since that time.  (*See* Consent Decree App. A, at 6-9).  Steady progress has been made after

mining began in 2008.[10]  Indeed, mining of Stage 1 of the McCook Reservoir is

approximately fifty percent complete, and mining of the Thornton Composite Reservoir is

approximately ninety-four percent complete.[11]  (Ex. 3, Padilla Decl. ¶ 34; Responsiveness

Summary at 4-5).

The Corps' responsibilities for the McCook Reservoir Project will not end with

completion of construction of the McCook Reservoir.  After the McCook Reservoir has been

---

[10]  More detailed background on the history of TARP is included in the Responsiveness Summary, which is Attachment 1 hereto, and in Exhibit 6 thereto (TARP Development, Construction and Implementation Timeline).

[11]  In October 2012, several cracks were observed on the service road adjacent to the McCook Reservoir site.  No further cracks have been observed and no further movement has been detected.  At this time, evaluation of the geologic conditions and potential impacts to the surrounding structures is not expected to cause a delay to the current mining schedule, though monitoring of the situation continues.  (Ex. 3, Padilla Decl. ¶ 47).

operating for a period of two to five years, long enough to obtain definitive information regarding performance of the system, the Corps, in conjunction with MWRD, will conduct an analysis under the Corps' program for inspection of completed Corps projects. The Corps and MWRD will evaluate the operation of the McCook Reservoir, including its effectiveness as to flood control, with a focus on areas that may need further improvement through changes in operational procedures. This analysis cannot be performed prior to such time, because it requires analysis of TARP while operational. (Ex. 3, Padilla Decl. ¶ 39).

       3.   <u>TARP Was Partially Constructed and in Operation Prior to<br>Issuance of the CSO Policy</u>

As noted above, TARP was adopted as a regional plan to control MWRD's CSO discharges (as well as for flood control) in 1972 and has been under construction continually since 1975. When EPA issued the CSO Policy in 1994, it recognized that some municipalities had already completed extensive planning and construction to abate CSOs, and therefore determined that the initial planning provisions of the policy would not apply to such municipalities. (59 Fed. Reg. at 18,690). MWRD qualified as such a community. Indeed, by 1994, MWRD had completed extensive planning and construction was ongoing in all four TARP tunnel systems, with substantial parts already completed and in operation.

Subsequently, in 1995, Illinois EPA, as the NPDES permitting authority, confirmed that TARP met the LTCP objectives of the CSO Policy, specifically stating its adequacy to meet water quality standards, and exempted MWRD from further planning requirements pursuant to Section I.C.2 of the CSO Policy. This in effect acknowledged the fact that TARP planning had long been completed, construction was well underway and some tunnels were operating at the time the CSO Policy was issued. (*See* Responsiveness Summary, Section V.A.1).

## IV. THE PROPOSED CONSENT DECREE

The proposed Consent Decree and its appendices contain a variety of enforceable interim and continuing requirements, the centerpiece of which is a set of provisions that place MWRD on an enforceable and expeditious schedule for completion of TARP, MWRD's approved LTCP to control CSO discharges. The Consent Decree schedule provides for major expansions of TARP's capacity within the next five years, making TARP, by far, the most extensive CSO storage system in the United States. The current storage capacity of TARP is approximately 2.65 billion gallons, which includes the entire deep tunnel system and the Majewski Reservoir. By the end of 2017, the Consent Decree requires the completion of an additional reservoir and the first phase of the final reservoir which will more than quadruple the current storage capacity. With a total CSO storage capacity of nearly 11 billion gallons, the TARP system in 2017 will stand in a class of its own as compared to the next largest CSO storage system in the country, in Milwaukee, which has a storage capacity of 521 million gallons, and the Cleveland area (NEORSD), which by 2035 will have the third largest CSO storage capacity of 384 million gallons.[12] (Consent Decree ¶¶ 16(d), 17(b); Responsiveness Summary at 91-94).

In accordance with the CSO Policy, MWRD must complete detailed post construction monitoring following completion of TARP to determine whether it has come into compliance with the CSO-related provisions of its NPDES permits, including applicable water quality standards requirements. (Consent Decree ¶¶ 35(a), 35(b)). The Decree cannot be terminated until after MWRD has done so. (*Id.* at Section XXII (Termination)).

---

[12] The CSO storage capacities refer to "gray" as opposed to "green" infrastructure. "Gray" infrastructure generally refers to engineered structural control practices to control CSO discharges, such as tunnel systems, storage tanks, sewer systems, wastewater treatment plants and pump stations.

In addition to requiring MWRD to complete TARP on an enforceable schedule, the proposed Consent Decree contains a comprehensive floatables control plan that substantially expands MWRD's river cleanup operations, including by requiring MWRD to purchase two skimmer boats to deploy within twenty-four hours of the conclusion of rain events that result in CSOs to collect floatable debris, unless unsafe or infeasible, in which case deployment must resume as soon as it is safe and feasible. The floatables program will operate on a year-round basis, thereby doubling the time period MWRD currently spends on a seasonal basis to control floatables.[13] Additionally, MWRD shall install a floatables collection boom in a specified location where installation is feasible and floatable debris from CSOs is known to occur. (Consent Decree App. B, Floatables Control Plan, Dkt. No. 3-3).

Finally, although neither the MWRD's LTCP nor MWRD's NPDES permits contain any specific requirements relating to green infrastructure measures, the proposed Consent Decree requires MWRD to implement a comprehensive green infrastructure program intended to help reduce CSO discharges, localized flooding and stormwater impacts.[14] Pursuant to the green infrastructure program, MWRD must implement projects that provide a minimum of ten million gallons of design retention capacity per individual storm. Additionally, MWRD must provide technical assistance to community groups to facilitate green infrastructure projects and implement a comprehensive land use policy on MWRD-owned land to provide incentives for private lessees and requirements for public lessees to implement green infrastructure projects.

---

[13] MWRD's current floatables control operations run from mid-April to mid-October. (Consent Decree App. B).

[14] Green infrastructure refers to practices to infiltrate, evapotranspire, or store and reuse rain water. Green infrastructure, generally speaking, uses vegetation and soil or on-site detention such as rain barrels or cisterns, to manage some rainwater where it falls.

The Consent Decree also contains various standard provisions, including stipulated penalties, reservations of rights and covenants not to sue from the United States and the State for the violations alleged in the Complaint through the date of lodging of the Consent Decree. Various provisions of the proposed Consent Decree are discussed in more detail in Section VI below, as well as in the Responsiveness Summary.

## V.  SUMMARY OF PUBLIC COMMENTS RECEIVED ON THE CONSENT DECREE

The United States received ten sets of public comments on the Consent Decree, ranging in length from several sentences to sixty-seven pages.  The Plaintiff-Intervenors submitted three sets of detailed comments, two of which were accompanied by a box containing numerous attachments.  The United States, in consultation with the State, has given careful consideration to all of the public comments received, a process that has involved extensive review of documents, discussions within the federal government regarding the specific comments received and proposed responses thereto, consultation with the State of Illinois and various technical experts, and discussions with MWRD.  The Responsiveness Summary, which is Attachment 1 hereto, provides a detailed response to all substantive comments received, whereas this memorandum summarizes and addresses the comments urging the Governments to withdraw, or the Court to deny entry of, the proposed Consent Decree.

The ten public comments received by the Department of Justice came from seven individual citizens[15] as well as nine citizen groups.[16]  All of the Plaintiff-Intervenors

---

[15] The individual commenters were Ms. Katherine Armstrong, Mr. Charles Dieringer, Mr. Chris Hodak, Ms. Jennifer Roche, Mr. Michael Skinner, Ms. Henrietta Saunders, and Mr. Justin di Giamberdine.

15

submitted overlapping comments, as some citizen groups joined more than one set of comments. The main concerns expressed in the comments related to (1) the schedule for completion of TARP and potential for delays due to the associated contingency provisions of the Decree; (2) the adequacy of interim measures to be implemented prior to completion of TARP, including floatables controls; (3) the amount of green infrastructure projects required and the schedule for completion of such projects; (4) application of the CSO policy to the settlement; and (5) the scope of the proposed Consent Decree, which contains relief for claims brought by the Governments but not for other potential claims.

## VI. THE CONSENT DECREE SHOULD BE APPROVED BECAUSE IT IS FAIR, REASONABLE, CONSISTENT WITH THE CWA, AND IN THE PUBLIC INTEREST

The Governments have carefully considered the public comments received on the proposed Decree and have concluded that nothing in the comments indicates that the proposed Consent Decree should not be entered. Plaintiffs submit that the Consent Decree should be approved because it is fair, reasonable, and consistent with the goals of the CWA.

### A. Standard of Review

The well-settled standard of review applied to a proposed government environmental settlement is whether the settlement is fair (from both procedural and substantive standpoints), reasonable, and consistent with the statute's purposes. *United States v. Davis*, 261 F.3d 1, 23-28 (1st Cir. 2001); *United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1424, 1426

---

[16] The United States received three sets of extensive comments from citizen groups. In its comments, the NRDC was joined by ELPC, Friends of the Chicago River, PRN, Sierra Club – Illinois Chapter, and the Southeast Environmental Task Force ("NRDC comments"). The Alliance was joined in its comments by ELPC, PRN, and the Southeast Environmental Task Force ("Alliance comments"). Finally, a subset of citizen groups submitted comments focused solely on green infrastructure issues, composed of the Center for Neighborhood Technology ("CNT"), ELPC, Friends of the Chicago River, NRDC, Openlands, PRN, Sierra Club, and Southeast Environmental Task Force ("CNT comments").

(6th Cir. 1991); *United States v. Cannons Eng'g*, 899 F.2d 79, 84 (lst Cir. 1990); *United States v. Fort James Operating Co.*, 313 F. Supp. 2d 902, 906 (E.D. Wis. 2004). As the Seventh Circuit has recently emphasized, in considering a settlement under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA") proposed by the Government, "the district court must approve a consent decree if it is reasonable, consistent with CERCLA's goals, and substantively and procedurally fair." *United States v. George A. Whiting Paper Co.*, 644 F.3d 368, 372 (7th Cir. 2011). The Seventh Circuit has cautioned that a district court should be "chary of disapproving a consent decree," and may not deny approval unless the decree "is unfair, unreasonable, or inadequate." *EEOC v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889-90 (7th Cir. 1985).

Unlike citizen groups, the "substantial expertise" of federal agencies such as EPA is granted broad deference when evaluating whether a settlement is fair, reasonable, and in the public interest. *See, e.g., United States v. District of Columbia*, 933 F. Supp. 42, 47 (D.D.C. 1996) ("broad deference should be afforded to EPA's expertise in determining an appropriate settlement"); *see also Whiting Paper,* 644 F.3d at 372 ("trial court must defer to the expertise of the agency and the federal policy encouraging settlement"); *American Canoe Ass'n, Inc. v. United States Envtl. Prot. Agency*, 54 F. Supp. 2d 621, 625 (E.D. Va. 1999) ("[I]n a complex case settled by consent decree, 'where a government agency charged with protecting the public interest has pulled the laboring oar in constructing the proposed settlement,' a reviewing court may appropriately accord substantial weight to the agency's expertise and public interest responsibility.") (quoting *Bragg v. Robertson*, 54 F. Supp. 2d 653, 660 (S.D. W.Va. 1999)).

17

The judicial deference to environmental settlements reached by the parties is "particularly strong" where, as here, that settlement "has been negotiated by the Department of Justice on behalf of a federal administrative agency like EPA which enjoys substantial expertise in the environmental field." *Akzo Coatings*, 949 F.2d at 1436; *see also Whiting Paper*, 644 F.3d at 372, and *Davis*, 261 F.3d at 21. Indeed, such settlements deserve "a strong presumption of . . . validity." *United States v. Wallace*, 893 F. Supp. 627, 631 (N.D. Tex. 1995). The balance of competing interests affected by a settlement with the federal government "must be left, in the first instance, to the discretion of the Attorney General," *Kelley v. Thomas Solvent Co.*, 717 F. Supp. 507, 515 (W.D. Mich. 1989) (citation omitted), since the Attorney General retains "considerable discretion in controlling government litigation and in determining what is in the public interest." *United States v. Associated Milk Producers, Inc.*, 534 F.2d 113, 117 (8th Cir. 1976); *see also Fort James*, 313 F. Supp. 2d at 907 ("The test is not whether this court would have fashioned the same remedy nor whether it is the best possible settlement.").

> B. <u>The Consent Decree is Procedurally and Substantively Fair Because it Remedies the Violations Alleged in the Complaint and Holds MWRD Accountable for its Past Violations</u>

In assessing the "fairness" of a proposed consent decree, courts examine whether the decree is both procedurally and substantively fair. *Davis*, 261 F.3d at 23; *Cannons Eng'g*, 899 F.2d at 86-87 (lst Cir. 1990). To determine whether a proposed settlement is procedurally and substantively fair, courts look to factors such as "the strength of the plaintiff's case, the good-faith efforts of the negotiators, the opinions of counsel, and the possible risks involved in the litigation if the settlement is not approved." *Akzo Coatings*, 949 F.2d at 1435 (citation omitted).

1. <u>The Consent Decree is Procedurally Fair</u>

Generally speaking, courts find procedural fairness where the settlement was negotiated at arm's length among experienced counsel. "Procedural fairness requires that settlement negotiations take place at arm's length." *In re Tutu Water Wells CERCLA Litig.*, 326 F.3d 201, 207 (3d Cir. 2003). If the decree was the product of good faith, arms-length negotiations, it is presumptively valid. *United States v. Oregon*, 913 F.2d 576, 581 (9th Cir. 1990); *see also United States v. Comunidades Unidas Contra La Contaminacion (CUCCo)*, 204 F.3d 275, 281-82 (1st Cir. 2000) (noting that there was "no evidence that the United States and [defendant] had other than an arms-length, good faith bargaining record" in upholding entry of settlement).

In this case, the settlement is the result of good faith and hard, arms-length bargaining between the Plaintiffs and MWRD, and thus meets the procedural fairness requirement. Commenters assert that the Governments have merely "reacted" to and "adopt[ed]" MWRD's proposals. (*See, e.g.*, Ex. 7-7, Alliance comments at 45-46). To the contrary, the Consent Decree reflects intensely negotiated compromises made by MWRD as well as the Governments, leading to a settlement that requires MWRD to implement – on an enforceable schedule – the CSO control plan approved by Illinois EPA and authorized by the Corps. Throughout the settlement process, attorneys and technical representatives from EPA, the Department of Justice, Illinois EPA, and the Illinois Attorney General's office, with the support of consulting technical experts, engaged in vigorous and extensive negotiations with MWRD's attorneys, who were sophisticated and experienced, and MWRD's highly qualified technical representatives. The parties met dozens of times over approximately four and one half years in intensive negotiations sessions regarding complex legal and technical issues, and

exchanged numerous drafts of the Consent Decree and various appendices. In between in-person meetings, MWRD and the Governments also communicated by phone regarding outstanding issues in the negotiations. The negotiations were technically detailed, focusing on expeditious completion of the reservoirs and TARP, floatables control technologies, maximizing flows for storage and treatment and other issues relating to TARP. These intensive negotiations that resulted in a mutually agreed upon proposed settlement provide ample support for the good faith efforts of the parties.

Additionally, EPA and Illinois EPA conducted a thorough review and investigation of MWRD, which included issuance of information requests by EPA under Section 308 of the CWA, 33 U.S.C. § 1318; analysis of voluminous data and other information submitted by MWRD in response to such requests that supplemented the information gained through settlement discussions between the United States, the State and MWRD; and site visits to numerous MWRD facilities such as water reclamation plants, pump stations, construction sites, and CSO outfalls. Further, the Governments consulted with mining experts at the United States Geological Survey ("USGS") and the Illinois State Geological Survey ("ISGS") regarding the pace of mining of the McCook Reservoir site. In sum, the settlement lodged with the Court is the product of lengthy and intensive negotiations supported by substantial information gathering.

As is the case with almost all negotiations, they were conducted out of the public arena and without participation by the Plaintiff-Intervenors. "In a matter that was of significant concern to the public, it is doubtful that a public settlement conference would ever permit the type of give and take that would lead to an agreed resolution of the dispute." *United States v. Town of Moreau, New York,* 979 F. Supp. 129, 135 (N.D.N.Y. 1997).

Nonetheless, and though not required to do so, the Governments met with various Plaintiff-Intervenors at their request during the course of the negotiations to learn what the Intervenors wanted included in a Consent Decree. *See CUCCo*, 204 F.3d at 277 (court rejected citizens group intervenors' objections to a settlement where the objections were based on a lack of participation by the intervenors in the negotiations).

       2.  The Consent Decree is Substantively Fair

Substantive fairness involves the concepts of corrective justice and accountability. *See Davis*, 261 F.3d at 24; *accord Cannons Eng'g*, 899 F.2d at 87; *CUCCo*, 204 F.3d at 281, citing *Cannons Eng'g*, 899 F.2d at 87. Given that the concepts of corrective justice and accountability "do not lend themselves to verifiable precision" in environmental cases, "EPA's expertise must be given 'the benefit of the doubt when weighing substantive fairness.'" *CUCCo*, 204 F.3d at 281, quoting *Cannons Eng'g*, 899 F.2d. at 87; *see also Cannons Eng'g*, 899 F.2d at 88 ("[A] district court should give the EPA's expertise the benefit of the doubt when weighing substantive fairness."). In that regard, the Seventh Circuit has recently reiterated that "a district court should defer to the Governments' expertise in weighing ambiguous and conflicting evidence of substantive fairness." *Whiting Paper*, 644 F.3d at 374.

The proposed Consent Decree is substantively fair because it holds MWRD accountable by requiring MWRD to implement appropriate injunctive relief to address its environmental violations, including completing construction of its LTCP to control CSOs on an expeditious and enforceable schedule. MWRD must also comply with performance standards set forth in the Consent Decree to optimize the operation of TARP and conduct post construction compliance monitoring after TARP is completed to ensure that TARP complies

with the CSO provisions of MWRD's then applicable NPDES permits, including applicable

water quality standards requirements.  (Consent Decree ¶¶ 28-34, 35, 36).  The Consent

Decree will not terminate until after MWRD demonstrates to the satisfaction of the Court that

it has achieved compliance with the CSO control requirements of its then-existing NPDES

permits, thereby holding MWRD accountable for remedying its past violations.  (*Id.* at ¶ 34,

Section XXII (Termination)).

Further, the floatables control program in the Consent Decree exemplifies the

Decree's substantive fairness, because it requires MWRD to implement specified and

effective measures to control floatables discharged from CSOs within twenty-four hours of

the conclusion of rain events that result in CSOs, including purchasing and deploying two

skimmer boats to capture and remove floatables.  (Consent Decree App. B).  This is in

addition to the skimmer boat already used by the City of Chicago to control floatables.[17]

Experience has shown that skimmer and trash collection boats are effective and commonly

used technologies to remove floatables discharged from CSOs or other sources, such as

windblown litter, from waterways.[18]  Skimmer boats will be particularly useful given the

nature of MWRD's combined sewer system.  MWRD's three NPDES permits have a total of

thirty-seven permitted CSO outfalls, while the satellite communities with sewer systems

connected to those MWRD WRPs have over three hundred CSO outfalls.  Skimmer or trash

collection boats are effective in such a system, because they collect floatables from all

---

[17] *See* http://www.cityofchicago.org/city/en/depts/streets/provdrs/street/svcs/cleaning_the_chicagoriver.html.

[18] As detailed in the Responsiveness Summary, skimmer boats have been used to pick up floatable materials in various cities, including Milwaukee, New York City, Washington, D.C., Passaic, New Jersey, and Philadelphia, Pennsylvania.  (Responsiveness Summary, 50 n.46).

potential sources, including the satellites' and MWRD's CSOs, as opposed to addressing only MWRD's permitted outfalls. (Ex. 4, Aistars Decl. ¶ 14). The floatables program will operate on a year-round basis, thus expanding MWRD's limited seasonal efforts to control floatables from mid-April to mid-October. Additionally, MWRD must place a collection boom in a specified location where such placement is feasible and floatable debris from CSOs can occur. (Consent Decree App. B).

The Governments reviewed and analyzed various methods to prevent, contain and remove floatables from CSO discharges in determining the adequacy of the floatables control program proposed in the Consent Decree. Containment booms were considered at other locations and rejected due in part to the potential hazard to navigation on river stretches that have commercial or recreational traffic. (Ex. 4, Aistars Decl. ¶ 16). The commenters also suggested the use of other technologies to control floatables that are otherwise not technologically suitable under these circumstances.[19] (*Id.* and Responsiveness Summary at 48-51).

In addition, the Decree is substantively fair because it requires MWRD to pay a substantial civil penalty of $675,000, $350,000 of which will be paid to the United States and $325,000 to the State. The Alliance commenters assert that the Governments should have obtained a higher penalty. (Ex. 7-7, Alliance comments at 42 n.178). However, a mere assertion by a commenter that a higher penalty could have been assessed in this matter, without any further detail, does not provide an adequate basis to reject the proposed Consent Decree. *See generally District of Columbia,* 933 F. Supp. at 52 (court approved a CWA

---

[19] *See* EPA, *Combined Sewer Overflows Guidance for Nine Minimum Controls*, May 1995, at 7-1, *available at* http://www.epa.gov/npdes/pubs/owm0030.pdf. *See also, e.g.*, EPA Post Construction Monitoring Guidance, 44 (May 2012), *available at* http://www.epa.gov/npdes/pubs/final_cso_pccm_guidance.pdf

settlement that included only injunctive relief, with no civil penalty, as fair, reasonable and in the public interest); *CUCCo,* 204 F.3d at 282 (approving settlement where court was "unable to say that the penalty level established by the decree represents an abandonment of judgment" by the United States, noting that consent decrees are the product of compromise).

In any event, the penalty here is a substantial one for a public entity, and appropriately takes into account Defendant's history of significant, albeit incomplete, implementation of the LTCP to abate its ongoing CWA violations at a cost of approximately $1.4 billion expended by MWRD thus far. In addition, violations of the Decree are subject to stipulated penalties. Moreover, in exchange for the work that MWRD will perform and the civil penalty that it will pay, the Decree resolves the civil claims alleged by the United States and the States as set forth in the Complaint through the date of lodging of the Consent Decree.

Finally, in evaluating a settlement under environmental statutes, fairness should be considered in light of the effect of the Decree on non-signatories – in this case, the public. *Akzo Coatings*, 949 F.2d at 1435. The citizens of MWRD's service area and the surrounding areas will benefit from this settlement because it would put MWRD on an enforceable and expeditious schedule to complete TARP, its LTCP for CSO discharges; provide for immediate interim controls for floatables; and conserve public resources though avoiding extensive litigation.

C. <u>The Proposed Consent Decree is Reasonable and Adequate Because It Contains Rigorous and Detailed Compliance Requirements, and the Schedule for Completion of TARP is Enforceable and as Expeditious as Practicable</u>

The reasonableness of the Consent Decree is basically "a question of technical adequacy, primarily concerned with the probable effectiveness of proposed remedial responses." *Cannons Eng'g,* 899 F.2d at 89-90; *Akzo Coatings*, 949 F.2d at 1437. The

proposed Consent Decree is reasonable and adequate because it includes numerous rigorous and detailed requirements to accomplish the goal of cleaning the environment. *See CUCCo* 204 F.3d at 281, citing *District of Columbia*, 933 F. Supp. at 50-51; *see also Cannons Eng'g*, 899 F.2d at 89, citing *United States v. Seymour Recycling Corp.*, 554 F. Supp. 1334 (S.D. Ind. 1982).

In *CUCCo*, the First Circuit Court of Appeals concluded that the adequacy and reasonableness of the consent decree in that case was shown by the "plethora of compliance requirements, qualitative standards, and ongoing monitoring and reporting." *CUCCo*, 204 F.3d at 281. Similarly, in *District of Columbia*, the court concluded that the stipulated agreement in that case was "technically adequate to accomplish the goal of cleaning the environment," pointing to the inclusion of short and long term equipment improvements and detailed schedules for equipment rehabilitation and maintenance, contractual obligations and reporting requirements. *District of Columbia*, 933 F. Supp. at 51.

The proposed Consent Decree contains compliance requirements that are technically adequate to address the violations alleged in the Complaint, including requiring completion of two massive reservoirs to complete TARP on a prescribed schedule, as well as implementation of performance standards to maximize operation of TARP, extensive post construction monitoring, a comprehensive floatables control program, a wide ranging green infrastructure program to supplement TARP, and specific monitoring, reporting and recordkeeping requirements to help ensure that the remedial measures are properly implemented. (*See* Consent Decree ¶¶ 16, 17, 18, 28-36, 43, 44, 75).

Most importantly, the proposed Consent Decree requires MWRD to complete construction of TARP on an enforceable and as expeditious as practicable schedule, in

accordance with the CWA's requirements, including a major initial expansion of TARP within five years. Completion of the Thornton Composite Reservoir in 2015 will add 4.8 billion gallons of storage capacity and complete the Calumet TARP system. Completion of Stage 1 of the McCook Reservoir in 2017 will add 3.5 billion gallons of storage capacity to the Mainstream/Lower Des Plaines TARP system. Thus, by the end of 2017, MWRD will add 8.3 billion gallons in CSO storage capacity to TARP for a total capacity at that time of approximately 11 billion gallons, more than four times the current design capacity of 2.6 billion gallons.[20] (Ex. 3, Padilla Decl. ¶ 10).

In determining whether the schedule for completion of mining was reasonable and appropriate, the Governments consulted with mining experts with decades of experience relating to mining issues, specifically geologist William Langer, formerly of the USGS, and Dr. Subash Bhagwat, a retired minerals economist from the ISGS. Mr. Langer, who has received a Masters Degree in Geology, was employed by USGS for forty years and served as the Research Geologist for Aggregate Resources at the USGS. His job responsibilities included conducting research on geologic issues related to the location, identification, characterization, extraction and processing of aggregates (rock, crushed stone, sand and gravel). (Ex. 1, Declaration of William Langer ("Langer Decl.") ¶¶ 3-4). Dr. Bhagwat has earned a Doctor of Philosophy Degree (Ph.D.) in Resource Economics, and has approximately forty years of experience in mining engineering and economics. He has been associated with the ISGS researching mineral economics since 1979, when he was appointed as the Head of the Mineral Economics Section, and has held the position of Principal Resource Economist (Retired) since 2005. (Ex. 2, Declaration of Subhash Bhagwat ("Bhagwat Decl.") ¶¶ 3-4, 6).

---

[20] Because the comments received regarding the schedule for completion of TARP primarily addressed the completion date for the McCook Reservoir, the Governments' responses to those comments do so as well.

The Governments have determined that the schedule for completion contained in the Consent Decree is reasonable and appropriate, given that (1) TARP will have by far the largest CSO storage volume of any LTCP in the nation, given in part the massive size of the McCook Reservoir; (2) the plan for excavating the rough hole for the McCook Reservoir by commercial mining at the market rate is efficient and has long been part of the approved LTCP and authorized Corps flood control project; (3) Vulcan is in a uniquely favorable position to mine the limestone to create the rough hole for the McCook Reservoir expeditiously; (4) the alternative mining methods suggested by commenters, such as stockpiling massive amounts of limestone, would raise significant environmental and feasibility concerns and waste valuable natural resources; and (5) mining the limestone faster than the market rate would not increase the demand for stone and would require stockpiling or disposing of potentially enormous quantities of limestone.

1. Given the Massive Size of the McCook Reservoir, its
   Completion Schedule is Reasonable and Appropriate

None of the public comments raised a specific question about the schedules for completion of the Thornton Composite Reservoir and Stage 1 of the McCook Reservoir under the Consent Decree, both of which must be completed and in operation by 2017, although several individuals raised concerns about the schedule for completion of TARP generally. However, two sets of commenters suggested that the schedule for completing Stage 2 of the McCook Reservoir in 2029 was too long in relation to schedules in "comparable" agreements for other combined sewer systems. (*E.g.*, Ex. 7-1, NRDC comment at 59). To the contrary, the schedule for completion of Stage 2 of the McCook Reservoir is not only reasonable and appropriate but expeditious, given the amount of stone to be excavated and the size and scope of the construction required. Indeed, the Consent Decree's schedule provides for a major

expansion of TARP within five years, making TARP, by far, the most extensive CSO storage system in the United States.  In any event, courts determine the appropriateness of a settlement based upon the particular claims alleged and relief achieved on a case by case basis, as opposed to comparing the proposed agreement to other settlements.  *See District of Columbia,* 933 F. Supp. at 50 ("[a]ny focus on fairness must address this Complaint and Agreement alone").  Regardless, the size and scope of TARP dwarfs other CSO LTCPs and thus any comparison to other CSO settlements would be inapposite.

The commenters fail to appreciate the enormous size of TARP in terms of tunnel and reservoir storage capacity and the impact that size has on TARP's construction schedule, as opposed to the construction schedules for gray infrastructure in other LTCPs compared favorably by the NRDC commenters.  (Ex. 7-1, NRDC comment at 58, 59).  As set forth in more detail in Section I of the Responsiveness Summary, TARP will have, by a substantial margin, the largest CSO storage volume of any LTCP in the country.  (Ex. 3, Padilla Decl. ¶ 12; Ex. 4, Declaration of Valdis Aistars ("Aistars Decl.") ¶ 22).  TARP's storage volume for CSO capture, upon completion, will be 17,456[21] million gallons.  (Consent Decree App. A, at 3, 4, 5, 9, 11, 13).  The second largest LTCP storage capacity by volume of NRDC's comparison communities is Cleveland (NEORSD), which will ultimately construct a storage volume of 384 million gallons for CSO capture by 2035.  (Ex. 4, Aistars Decl. ¶ 22; Ex. 5, Middleton Decl. ¶ 7).  As detailed in the Responsiveness Summary, TARP is scheduled to be completed sooner than many of the other specified LTCPs, but will take longer overall considering that tunnel construction started in 1975.  (*See* Responsiveness Summary Section

---

[21] This figure is sometimes rounded to 17,500 million gallons or 17.5 billion gallons.

I).  Given the substantial difference in the amount of construction involved, it is not surprising that the construction schedule for TARP would take longer than for the other LTCPs.

One way to compare LTCP construction schedules on an "apples to apples" basis is by calculating the amount of storage capacity constructed.  If MWRD completes TARP in 2029, on an annualized basis, the storage volume constructed for CSO capture will be an average of 323 million gallons per year counting from the year MWRD began tunnel construction in 1975.[22]  (Ex. 4, Aistars Decl. ¶ 23; Ex. 5, Middleton Decl. ¶¶ 7, 8).  That is more than the *total* storage capacity amount for each of the cities the commenters used for comparison purposes, except Cleveland.  By comparison, for example, Cleveland (NEORSD) and Indianapolis will have constructed an annualized average CSO storage volume of 11.3 million gallons and 11.4 million gallons per year.  (Ex. 5, Middleton Decl. ¶ 7).  At the Cleveland rate of 11.3 million gallons storage capacity constructed per year it would take MWRD 1,545 years to achieve the 17.5 billion gallon capacity of TARP.[23]  (Ex. 4, Aistars Decl. ¶ 24).

This does not mean to suggest that comparing the completion schedules of different CSO LTCPs is necessarily appropriate.  Each LTCP should be suited uniquely to the characteristics of that community's sewer and wastewater treatment systems, and such plans may vary in so many ways that a direct comparison may be misleading.  Even if there were some value in comparing the sheer amount of the CSO storage volume captured, the reasonableness of the schedule depends on the specific facts pertaining to the LTCP at issue. With its massive storage volume that dwarfs other systems, TARP is simply so many times

---

[22] EPA calculated an annual average amount of constructed storage capacity by dividing the total storage capacity of 17,456 million gallons by the number of years, 54.  MWRD did not actually construct at that rate on a yearly basis, but created substantially greater storage capacity during some years and substantially less during other years.  The annualized storage volume constructed is provided for purposes of illustration.

[23] This also reflects in part, funding availability and the very large storage volumes gained in reservoirs.

larger than the other LTCPs cited by commenters that its schedule cannot fairly be compared directly with theirs. (*Id.*)

> 2. Commercial Mining of Quarries at the Market Rate is Efficient and Part of the Approved LTCP and Authorized Corps Project

Due to the huge amount of rock to be excavated to create the rough holes for the reservoirs and the fact that the rough holes were planned to be located in quarries, the plans for construction of TARP provided for quarry companies to excavate the rock according to normal commercial mining operations based upon market demand. This means of excavation has long been integral to TARP, as reflected in the Corps' 1986 feasibility study. (Responsiveness Summary at 29). Commercial mining at the market rate remained part of TARP when IEPA approved TARP as MWRD's LTCP for control of CSO discharges in 1995 and when the Corps authorized the reservoir portion of TARP as a flood control project in 1999. By excavating rock through commercial mining at the market rate, MWRD will obtain an empty quarry after the operator has finished mining at substantially less cost and without having to dispose of the excavated rock. The resulting cost savings and operational efficiencies allow the project to proceed faster and the arrangement also provides an environmental benefit by avoiding the impacts of double-handling the rock by stockpiling or disposing of over 100 million tons of limestone, as explained in more detail below.

> 3. Vulcan is in a Uniquely Favorable Position to Mine the McCook Reservoir Expeditiously

Vulcan is in a unique and extremely favorable position to excavate the hole for the McCook Reservoir in an expeditious manner. Vulcan's McCook quarry is located almost next door to the McCook Reservoir site. This position is enhanced by the fact that Vulcan is a very large and efficient mining operator; indeed, Vulcan has been the largest producer of

aggregate by volume in the nation for at least 23 years. (Ex. 1, Langer Decl. ¶¶ 19, 22). The McCook Reservoir site itself produces more aggregate than any other quarry in the greater Chicago area and has been in approximately the top 0.5 percent of crushed stone production in the country since Vulcan has been mining the site. (*Id.* at ¶ 21).

As Mr. Langer observed on a site visit in June of 2012, Vulcan transports excavated rock directly from the McCook Reservoir site via conveyor belt to the Vulcan quarry and plant for processing and sale. This direct conveyance allows rock to be crushed and processed quickly and efficiently by Vulcan at the space already available at its quarry next door. By transporting the rock via conveyor belt from the McCook Reservoir site to Vulcan's quarry, MWRD has avoided having to construct an access road to allow trucks access to transport rock to Vulcan's quarry or another quarry for crushing and processing prior to sale, and has avoided the associated truck traffic. (*Id.* at ¶ 22).

Commenters suggested that a different mining operator may have been willing to agree to a more expeditious schedule. (Ex. 7-1, NRDC comment at 34). However, leaving aside that switching mining operators would necessitate MWRD breaking its current contract with Vulcan, if a mining operator other than Vulcan were to mine the McCook Reservoir site, it would face significant delays. Unless the new operator already had an existing quarry nearby, it would need to obtain a location to process and temporarily store some crushed stone prior to disbursing and would need to obtain the necessary operating permits, which can be a lengthy process. (Ex. 1, Langer Decl. ¶ 23).

Even if a new storage and processing area could be obtained and permitted, which is not assured, the rock excavated at the McCook Reservoir site would have to be transported to the outside quarry for processing, which would create inefficiencies, increase costs, and result

in double-handling of the stone by the new operator.  Because most of the aggregate from the McCook Reservoir site is transported by diesel trucks, the double-handling of the stone would lead to greater diesel air emissions, as well as dust, from the trucks.  (*Id.* at ¶ 24; Ex. 4, Aistars Decl. ¶ 21).  For example, transporting seven million tons of crushed stone by truck from the McCook Reservoir to a new processing site and then to customers on an annual basis would require an additional 280,000 truck trips per year.  (Ex. 1, Langer Decl. ¶ 24).

4. <u>The Alternative Mining Methods Suggested by Commenters, Such as Stockpiling, Would Raise Significant Environmental and Feasibility Concerns and Waste a Very Valuable Natural Resource</u>

Two commenters suggested that MWRD mine the rough hole without selling the excavated rock in the commercial market, and give away or dispose of any stone that could not be disbursed, asserting that this would accelerate completion of the McCook Reservoir. (Ex. 7-1, NRDC comment at 34-35; Ex. 7-7, Alliance comment at 26).  Giving away or disposing of the limestone would require long-term stockpiling massive amounts of aggregate which would raise significant feasibility, environmental and safety concerns, as well as waste a valuable natural resource.

As part of their typical operations, mining operators temporarily stockpile limited amounts of stone to await delivery to customers.  Crushed stone of different sizes and quality are put in separate piles, depending upon the requirements of varying customers.  (Ex. 1, Langer Decl. ¶ 14).  In contrast, the NRDC and Alliance commenters have suggested continuing to excavate stone without regard to customer demand, which would lead to large amounts of stone needing to be stockpiled for long periods of time or disposed of.  The rock produced in excess of market sales due to mining at a prescribed rate would likely have to be stored off-site, thereby requiring the stone to be transported twice, first to the off-site

stockpile and then to the customer, as opposed to stored temporarily on site awaiting delivery. The size of the stockpile that would be needed to store the remaining stone at the McCook Reservoir site would cover more than one square mile for a 35-foot high stockpile. (*Id.* at ¶ 57).

Stockpiling the amount of stone to be excavated from the McCook Reservoir site would likely degrade and contaminate some of the stone, possibly rendering it unsuitable for construction or other commercial uses.[24] (*Id.* at ¶ 32). Stockpiling excavated stone, particularly on such a large scale as would be required for the rock remaining in the McCook Reservoir site or even a significant portion thereof, may raise safety issues including vulnerability to stockpile collapse due to equipment weight and vibration of mobile equipment operating at or near the stockpile. (*Id.* at ¶¶ 61-62).

One set of commenters suggested that stockpiled rock could be transported to a suitable location for ultimate disposal. (Ex. 7-1, NRDC comment at 35). However, if hauled to a landfill, it would take up a very large amount of valuable landfill space as well as waste a natural resource. Seven million tons of crushed stone, the annual amount targeted for excavation in the Vulcan Contract,[25] would occupy 3.6 million cubic yards once compacted. This would equal two-thirds the amount of compacted material placed annually in Chicago-area landfills. (Ex. 1, Langer Decl. ¶ 63). Moreover, failing to put this resource to productive use would have a real and adverse effect on the local economy. Transporting a heavy material like aggregate is relatively expensive (not to mention the environmental effects of fuel

---

[24] Stockpiling can also result in adverse environmental consequences such as changes to pH and vegetation necessitating remediation and double-handling of rock resulting in increased air emissions. (Ex. 1, Langer Decl. ¶¶ 60-61).

[25] (Ex. 29, Vulcan Contract ¶ 3.5).

consumption), so discarding material for this very large, already-developed source of aggregate close to areas of high demand would be seriously ill-advised.

According to figures provided by MWRD, as of May 2012, approximately 97 million tons of aggregates remained at the McCook Reservoir site.  To provide an illustration of the amount of crushed stone at issue, Mr. Langer calculated the size of the stockpile that would be needed to store the remaining stone from the McCook Reservoir site, and determined that stockpiling it would result in a 35-foot high stockpile (or disposal site) covering an area of more than one square mile.  (Id. at ¶¶ 41-57).  Were this stockpile constructed in downtown Chicago, it would essentially cover the "Loop" and Grant Park, extending from the lakefront west to the South Branch of the Chicago River and from the Chicago River on the north side to Roosevelt Road.  (*See* Ex. 1, Langer Decl. Attach. A and Attach. B).

Aggregate is a very valuable natural resource that has many uses, including in commercial and residential construction, as well as for building roads.  Aggregates are important to the State's construction industry, which in turn has a multiplier effect on the State's economy overall.  No other material can take its place for such construction uses.  (Ex. 2, Bhagwat Decl. ¶ 12).  According to calculations made by Mr. Langer, the total dollar value of the stone remaining in the McCook Reservoir as of May 2012 was approximately $1 billion.  (Ex. 1, Langer Decl. ¶ 40).  Thus, stockpiling resulting from mining without regard to market demand would lead to the potential loss of an extremely valuable natural resource.  This loss is accentuated because sources of permitted aggregates in the Chicago area are not abundant.  (*Id.* at ¶ 39).

5. <u>Mining Without Regard to Market Conditions
   Would Not Increase the Demand for Stone</u>

Two sets of commenters have suggested that mining without regard to market

conditions would increase the rate of excavation for the McCook Reservoir and thereby

shorten the schedule for completion of TARP. (Ex. 7-1, NRDC comment at 34; Ex. 7-7,

Alliance comment at 26). However, the underlying economic principles impacting the market

for aggregates make clear that mining without regard to commercial conditions by giving

away the stone would not increase demand for that stone, and thus would not accelerate the

pace of mining at the McCook Reservoir site. Similarly, reducing or eliminating the royalty

paid by Vulcan to MWRD would not increase the pace of mining, either, and would benefit

only Vulcan while ultimately increasing the costs borne by MWRD rate-payers.

Since Vulcan is commercially mining the rough hole for the McCook Reservoir, the

speed of excavation is therefore governed by the general economic principles of the

aggregates market. According to Dr. Subhash Bhagwat, the market for mined aggregates is

typical for commodities in that it is almost solely driven by the demand of end-users of the

resource. The economic principle of "elasticity of demand" is the degree to which demand

for a good or service varies with its price. Demand for goods such as cars and appliances is

more elastic than for food and medicine; the latter, therefore, is less influenced by price

changes than the former. The cost of aggregate generally makes up a relatively small part of

the cost of projects in which it is used. Thus, demand for aggregates is dictated by buyers'

needs, as opposed to the price, and the rate of excavation of aggregates closely follows user

demand. (Ex. 2, Bhagwat Decl. ¶ 9). For that reason, attempts to increase demand, such as

by decreasing the price, will have little or no effect and stockpiling of excess rock will result.

(*Id.* at ¶¶ 11, 15, 16, 20).

35

Two sets of commenters also suggested that lowering the amount of, or removing, the royalties paid by Vulcan to MWRD under MWRD's agreement with Vulcan would provide incentives for Vulcan to increase the pace of mining at the McCook Reservoir site. (Ex. 7-7, Alliance comment at 26; Ex. 7-1, NRDC comment at 34). Under the Vulcan Contract, Vulcan generally pays MWRD a royalty of four percent on stone removed from the McCook Reservoir site. (Ex. 29, Vulcan Contract Section 7). It is common practice in the aggregates industry to pay the owner of aggregates a royalty for access to the owner's property and use of the owner's mineral rights. (Ex. 2, Bhagwat Decl. ¶ 16; Ex. 1, Langer Decl. ¶ 67). And, a four percent royalty payment to MWRD for mining the stone is within the range of royalties typically paid for aggregates. (Ex. 2, Bhagwat Decl. ¶ 17; Ex. 1, Langer Decl. ¶ 67). Vulcan, the largest producer of aggregates in the country as of 2011, the most recent year for which figures are available, is a sophisticated mining operator with every incentive to maximize profits, and agreed to this royalty amount. (*See* Ex. 1, Langer Decl. ¶ 19).

In any event, the cost of stone is a relatively small part of the cost of construction projects overall. As a result, contractual royalties paid to the owner of the reserves will have a negligible effect on the market for the mined aggregates, because the price of such aggregates does not drive demand. Rather, demand for stone is dictated by the needs of prospective buyers. Therefore, any decrease in the price for the rock resulting from a reduction or elimination of royalties would not generate a need for the product, and thus would not incentivize excavation at a faster rate. (Ex. 2, Bhagwat Decl. ¶ 16). Moreover, most aggregate is sold within 20 miles of a quarry, due to the high costs of transporting the rock. Indeed, the market area is set based upon the high cost of transporting the aggregates. (*Id*. at ¶ 18). Further, Vulcan has the incentive to remove rock as quickly and efficiently as possible

36

to maximize its profits. As the McCook Reservoir site produces more aggregate than any other quarry in Illinois, and is in the top ten of quarries nationwide, Vulcan is in an excellent position to do so. (Ex. 1, Langer Decl. ¶ 21).

6. <u>The Contingency Provisions of the Decree Appropriately Address the Potential for Delays in the Schedule for Completion of TARP</u>

The Alliance and NRDC commenters (Plaintiff-Intervenors) expressed concern that the proposed Consent Decree contains contingency event provisions that address the potential for schedule delays outside of MWRD's control. The contingency event provisions in the Decree are reasonable given the particular factual circumstances in this case. Recognizing that TARP is not only the approved LTCP, but is also a Corps project authorized by Congress and partly performed by the Corps, the proposed Consent Decree acknowledges that the schedule for completion of the reservoirs is based, in part, on (1) the completion of excavation of the reservoirs by commercial quarry operators and, (2) for the McCook Reservoir, on the timely completion of specific project elements by the Corps. Thus, the Consent Decree provides a mechanism to address potential schedule disruptions resulting from delays associated with the rates of excavation by the mining operators. The proposed Decree also allows for a schedule extension for the McCook Reservoir if the Corps fails to perform work that it undertook in the Project Cooperation Agreement that sets forth the Corps' obligations, as well as MWRD's, in constructing the reservoir. (Consent Decree ¶ 19).

To qualify for a schedule extension under the contingency event provisions, MWRD must meet stringent requirements and follow prescribed procedures. Among other things, MWRD must demonstrate that it has satisfied all contractual obligations to the relevant mining contractor or the Corps that impact the mining schedule at issue; that it has made "all

practical efforts consistent" with the applicable agreement to avoid the occurrence of a

contingency event; and that the delay is "caused entirely" by an event or events beyond

MWRD's control. (*Id.* at ¶ 20). Moreover, MWRD cannot claim this contingency for delays

caused solely by the unavailability of federal funds and it may be required to advance funds

for the flood control portion of the project in the short term, subject to certain legal

limitations. (*Id.*). Thus, the Consent Decree properly accounts for the possibility that the

schedule for completion of the reservoirs could be impacted by circumstances outside of

MWRD's control and ensures that any adjustment to the schedule must be adequately

supported. In the event that MWRD meets the stringent criteria necessary to extend the

completion date of a reservoir, it must then implement additional green infrastructure projects.

(Consent Decree App. E, at 6, MWRD Green Infrastructure Program, Dkt. No. 3-6). Section

IV of Appendix E to the Consent Decree specifies the amount of additional green

infrastructure required for each Contingency Event, and the time frames within which MWRD

must complete the projects. For example, for Contingency Events related to Stage 2 of the

McCook Reservoir, MWRD must implement green infrastructure projects totaling 250,000

gallons of design retention capacity for each grant of a Contingency Event. (*Id.*).

    D.  <u>The Green Infrastructure Program that Serves as a Supplement to
TARP is Reasonable and Adequate</u>

The proposed Consent Decree's provisions pertaining to green infrastructure are

reasonable and adequate. Several commenters urged the Governments to expand the green

infrastructure required under the Consent Decree, asserting that the specified green

infrastructure measures are insufficient in comparison to other consent decrees, are incapable

of accurate measurement, unenforceable, and do not require a "sufficient" expenditure of

funds by MWRD. (Ex. 7-7, Alliance comment at Section V; Ex. 7-1, NRDC comment at

Section III). To the contrary, the Consent Decree contains substantial and measurable green infrastructure requirements that will require MWRD to be accountable for implementation of the green infrastructure program. EPA estimates that it will cost between $25 million and $50 million to implement the green infrastructure program, based upon a calculator developed by NRDC and its consultant, which is a substantial expenditure given the fact that neither the NPDES permits nor MWRD's LTCP requires it to implement green infrastructure. (*See* Attach. 1, Responsiveness Summary at 71-73).

The proposed Consent Decree requires MWRD to implement green infrastructure projects to meet specified retention capacities by specified milestone dates within five, ten and fifteen years after entry of the Consent Decree, with the majority of the expansion in retention capacity required in the first ten years. (*Id*.). As part of the Green Infrastructure Plan required by the Consent Decree, MWRD must implement green infrastructure projects that provide, in the aggregate, a minimum of 10 million gallons of design retention capacity that would be available to capture runoff *in an individual storm*. (Consent Decree App. E, at 5; emphasis added). Commenters compared this amount unfavorably to some recent federal environmental CWA settlements with other municipalities, incorrectly asserting that at least one city was required to implement up to four times the amount of green infrastructure required in the MWRD Decree. (Responsiveness Summary at 68; NRDC comment at 56).

Leaving aside momentarily whether such a comparison is appropriate, it appears that the commenters did not understand that the design retention capacity requirement in the MWRD Decree applies per each individual storm, whereas other cities had requirements based upon gallons of CSOs reduced in a typical year. Further, some cities will be able to decrease the amount of gray infrastructure (such as tunnels or large impoundments) required

in exchange for implementing additional green infrastructure. In contrast, MWRD must implement all of TARP's gray infrastructure requirements regardless of how much green infrastructure it implements. In any event, it is not appropriate to compare the scale and cost of green infrastructure measures between different cities, because their differing hydrological, topographical, soil, climate, and historical characteristics, as well as gray infrastructure facilities unique to each city, will result in different combinations of CSO controls. Moreover, nothing in the Consent Decree prevents MWRD or any other entity from implementing additional green infrastructure. Indeed, the Consent Decree is designed to serve as a catalyst for increasing the use and acceptance of green infrastructure measures.

Importantly, the Consent Decree requires extensive recordkeeping by MWRD and periodic reporting to the Governments regarding implementation of the green infrastructure program. To track compliance with these requirements, MWRD must maintain an inventory of completed green infrastructure projects, including project locations, collaborating partners, type and size/scope of the projects, and the entity responsible for project maintenance, as well as the project's design retention capacity. (Consent Decree App. E, at Section III). MWRD will determine the estimated design retention capacity of green infrastructure projects either through a certification by a Professional Engineer or using values derived from a green infrastructure calculator developed (in part) by NRDC, such as the design retention capacity for each 100 square feet of rain gardens or porous pavement. (*Id.*). MWRD must then report to the Governments regarding the green infrastructure projects implemented, as specified in Section V.C of Appendix E to the Consent Decree. (*Id.* at Section V.C).

E.  The Decree Sufficiently and Appropriately Addresses the
    Violations Alleged In the Complaint

The Alliance and NRDC commenters assert that the proposed Consent Decree is

inadequate because it does not remedy what they characterize as potential violations in their

comments.  These alleged potential claims, however, were not included in the Governments'

Complaint or even in the Plaintiff-Intervenors' complaints in intervention.[26]  (Ex. 7-7,

Alliance comment at 18-24; Ex. 7-1, NRDC comment at 40-43).  The fact that the Consent

Decree does not address claims outside of the purview of the Complaint provides no basis to

disapprove the settlement.  As described above, the Consent Decree comprehensively

addresses the claims brought by the Governments, imposing compliance measures that will

remedy the violations alleged.  In turn, the Consent Decree provides a covenant not to sue to

MWRD limited to the specific violations alleged in the Complaint through the date of

lodging.  The Governments do not consider it appropriate to opine on potential allegations not

at issue in this case.

The Governments properly exercised their enforcement discretion in determining

claims to allege in the Complaint, and courts should be wary of infringing upon such

discretion.  Indeed, "'when the government is challenged for not bringing as extensive an

action as it might, a district judge must be careful not to exceed his or her constitutional

role.'"  *District of Columbia,* 933 F. Supp. at 47 (quoting *United States v. Microsoft Corp.,* 56

F.3d 1448, 1462 (D.C. Cir. 1995)).  Moreover, the court is "not to 'reach beyond the

complaint to evaluate claims that the government did not make and to inquire as to why they

---

[26]  The complaint filed by the Alliance Plaintiff-Intervenors in this action did, however, allege that MWRD contributed to exceedances of water quality standards relating to fecal coliform bacteria in violation of Special Condition 5 of its NPDES permits.  This is the only claim in either of the Plaintiff-Intervenors' complaints in intervention in this action that goes beyond the claims alleged by the Governments in their Complaint.

were not made.'" *Id.*, quoting *Microsoft*, 56 F.3d at 1459; *cf. Sec. and Exch. Comm'n v. Citigroup Global Mkts. Inc*., 673 F.3d at 158, 163 (2nd Cir. 2012) ("[i]t is not, however, the proper function of federal courts to dictate policy to executive administrative agencies.").

    F.   <u>The Proposed Consent Decree is in the Public Interest and<br>Consistent With the Objectives of the Clean Water Act</u>

The Consent Decree is consistent with the CWA, and comports with the specific statutory policies that underlie this case, including the CSO Policy. The overarching goal of the CWA is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The overarching goal of the CSO Policy is to bring all wet weather CSO discharges into compliance with the technology–based and water quality-based requirements of the CWA as soon as practicable and to minimize water quality, aquatic biota, and human health impacts from CSOs. (59 Fed. Reg. at 18,689). In addition to requiring completion of an approved LTCP on an enforceable schedule, the proposed Consent Decree furthers the goals of the CWA by requiring MWRD to perform post construction monitoring to evaluate the effectiveness of the CSO controls. In accordance with the CSO Policy, MWRD must conduct post construction monitoring following completion of TARP to determine whether MWRD has come into compliance with the CSO-related provisions of its NPDES permits, including applicable water quality standards requirements. (Consent Decree ¶¶ 35(a), 35(b)).

The CSO Policy provides that communities whose LTCPs were substantially developed or being implemented prior to issuance of the policy must nonetheless be consistent with the policy's post construction monitoring provisions, which require municipalities to conduct a water quality assessment program following construction of the LTCP, including monitoring for compliance with water quality standards. (59 Fed. Reg. at

18,690).[27]  To that end, MWRD must submit for the Governments' approval a post

construction monitoring plan for the Calumet TARP system within one year of entry of the

Decree and for the Mainstream/Lower Des Plaines system within five years thereof.

MWRD's post construction monitoring plan must include CSO frequency and duration

monitoring, as well as estimated CSO volumes; identification of water quality standards

parameters of concern; applicable in stream water quality monitoring; and determination of

whether MWRD's CSOs are in compliance with the then-effective relevant NPDES permit.

(Consent Decree, Section IX).

     MWRD must implement each post construction monitoring plan after it has

commenced full operation of the respective reservoir.  (*Id.* at ¶ 35).  Following completion of

the monitoring specified in each plan, MWRD must submit a final post construction

monitoring report to EPA for EPA to determine, after consultation with Illinois EPA, whether

MWRD has come into compliance with the CSO-related provisions of its NPDES permits,

including water quality standards requirements.  (*Id.*).  If EPA finds that MWRD is not

meeting the CSO control requirements of its applicable NPDES permits, MWRD must then

prepare a compliance plan that analyzes a reasonable range of alternatives for additional

measures, with proposed schedules, to bring MWRD into compliance.  (*Id.* at ¶ 36).  MWRD

cannot terminate the Consent Decree until it has achieved satisfactory compliance with the

CSO-related provisions of its NPDES permits.  (*Id.* at ¶ 34, Section XXIII (Termination)).

These post construction requirements are set forth in an enforceable mechanism with

appropriate deadlines, stipulated penalties for noncompliance, and dispute resolution

---

[27] *See Combined Sewer Overflows, CSO Policy*, http://cfpub.epa.gov/npdes/cso/cpolicy.cfm (last visited April
23, 2013).

provisions to ensure full and timely compliance. Thus, the Decree ensures that the CSO and other control measures implemented by MWRD will achieve compliance with the CWA as well as be consistent with the CSO Policy.

In this case the same elements of the proposed settlement that demonstrate its reasonableness also show that it serves the public interest and is consistent with the purposes of the CWA. In addition, although neither the MWRD's LTCP nor MWRD's NPDES permits contains any specific requirements relating to green infrastructure measures, the proposed Consent Decree nonetheless requires MWRD to implement a comprehensive green infrastructure program intended to help reduce CSO discharges, localized flooding, and stormwater impacts. The green infrastructure program is also intended to be a catalyst for implementation of green infrastructure projects in the Chicago area beyond those required under the Decree and includes a number of provisions specifically targeted for that purpose. In that regard, the Decree requires MWRD to provide green infrastructure community assistance in the form of administrative and technical assistance to satellite communities to help them develop and implement green infrastructure projects, including working with communities on updates to local ordinances to remove barriers to green infrastructure implementation. (Consent Decree App. E, at 3).

The green infrastructure program also provides opportunities for partnerships, collaboration and public participation by stakeholders including municipal and governmental entities, business and commercial entities, non-governmental organizations, members of the public, and other interested parties, for planning and implementing green infrastructure projects. (*Id.*). Additionally, the proposed Consent Decree requires that MWRD include prioritization criteria and processes for selecting green infrastructure project locations where:

44

(1) green infrastructure control measures will help reduce flooding and basement backups; (2) land ownership will readily accommodate permanent green infrastructure control measures and maintenance thereof; and (3) green infrastructure control measures can improve socio-economic conditions in the MWRD service area, with the highest priority given to neighborhoods where the need for improvement is the greatest, all of which will benefit the public. (*Id.* at 4).

Similarly, the Consent Decree requires MWRD to implement a comprehensive land use policy on MWRD-owned land to encourage green infrastructure projects. Pursuant to that policy, MWRD must develop green infrastructure guidelines/requirements for land leased for public uses that requires new or renewed leases to incorporate green infrastructure. MWRD must further develop an incentive program to encourage development of green infrastructure projects on land leased for private use. MWRD must also submit program guidelines to the Governments for implementation of the land use policy. (*Id.* at 2).

Another aspect of the public interest is weighing whether to compromise a case or litigate it. As recently recognized by the Second Circuit in *SEC v. Citigroup Global Markets. Inc.*, 673 F. 3d 158, 163-64 (2nd Cir. 2012), the government's evaluation of whether it is in the public interest to settle a case is entitled to deference, and the "the scope of a court's authority to second-guess an agency's . . . decision to settle [a case] is at best minimal." The Second Circuit in *Citigroup* reasoned as follows:

> The numerous factors that affect a litigant's decision whether to compromise a case or litigate it to the end include the value of the particular proposed compromise, the perceived likelihood of obtaining a still better settlement, the prospects of coming out better, or worse, after a full trial, and the resources that would need to be expended in the attempt. In the case of a public executive agency such as the [Securities and Exchange Commission], the factors include also an assessment of how the public interest is best served.

These are precisely the factors that the Supreme Court has recognized as making a discretionary agency decision unsuitable for judicial review.

*Id.*

Here, EPA and Illinois EPA, public agencies with environmental expertise, together with the Department of Justice and the Office of the Illinois Attorney General, have all concluded that the public interest is best served through entry of the proposed Consent Decree rather than litigation. Indeed, the Decree reflects the parties' careful and informed assessments of the merits of the governments' claims; the costs, risks, and delays that litigation would entail; and the benefits that will accrue by immediately commencing to construct and implement the injunctive measures required by the proposed Decree. Although the Governments believe that they would ultimately prevail on the claims alleged in the Complaint, it would likely take years to litigate over the highly complex scope and schedule of the necessary injunctive relief, with no guarantee that the resulting remedial plan would be any more expeditious or better than that embodied in the proposed Consent Decree. Further, if this case did not settle, litigation over the appropriate injunctive relief as well as other complicated issues would consume a tremendous amount of the parties' (and the Court's) limited resources – resources that could be devoted toward remedying the environmental problems at issue here (and in other cases).

VII.  CONCLUSION

The proposed Consent Decree would put MWRD on an enforceable and as expeditious as practicable schedule to complete TARP, its long term control plan to control CSO discharges.  By the end of 2017, the Consent Decree requires the completion of two reservoirs that will more than quadruple TARP's current storage capacity.  The Thornton Reservoir, which is to be completed by December 31, 2015, will add approximately 4.8 billion gallons of combined sewage storage capacity.  Stage 1 of the McCook Reservoir, which is to be completed by December 31, 2017, will add yet another 3.5 billion gallons of storage capacity.  With a total CSO storage capacity of nearly 11 billion gallons as of 2017, the TARP system will stand in a class of its own as compared to the next largest CSO storage system in the country.  The completion date of 2029 for Stage 2 of the McCook Reservoir is as expeditious as practicable, given the massive size of that reservoir and the enormous practical advantages of removing the stone at a rate that matches its salability in the market.

The proposed Consent Decree also requires MWRD to conduct comprehensive post construction monitoring following completion of TARP to ensure that MWRD's CSO discharges are in compliance with the CSO-related provisions of its then-effective NPDES permits, including applicable water quality standards requirements, prior to termination of the Consent Decree.  The Consent Decree would terminate only after MWRD demonstrates that it has achieved satisfactory compliance with the CSO control requirements of its then-existing NPDES permits, including applicable water quality standards requirements, thereby holding MWRD accountable for its performance.  (Consent Decree ¶¶ 34-36, 95(b)).  In sum, because the Consent Decree would require measures adequate to achieve compliance with the CWA and MWRD's permit requirements on an expeditious and enforceable schedule, provide for

interim compliance measures and a wide ranging green infrastructure program, and ensure

compliance prior to termination, the settlement is fair, reasonable, adequate and in the public

interest and should be entered by the Court.

Respectfully submitted,

FOR THE UNITED STATES:

IGNACIA S. MORENO
Assistant Attorney General
Environment & Natural Resources Division
United States Department of Justice

s/Catherine Banerjee Rojko
CATHERINE BANERJEE ROJKO
Senior Attorney
STEVEN D. ELLIS
Senior Counsel
Environmental Enforcement Section
Environment & Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C.  20044-7611
Tel: (202) 514-5315
Fax: (202) 616-6584
cathy.rojko@usdoj.gov
steven.ellis@usdoj.gov


GARY S. SHAPIRO
Acting United States Attorney

KURT N. LINDLAND
Assistant United States Attorney
219 South Dearborn Street, Suite 500
Chicago, Illinois  60604
kurt.lindland@usdoj.gov
Tel: (312) 353-4163
Fax: (312) 886-4073

OF COUNSEL:

DEBORAH A. CARLSON
Associate Regional Counsel
Office of Regional Counsel
U.S. Environmental Protection Agency
Region 5 (C-14J)
77 West Jackson Blvd.
Chicago, Illinois  60604

SUSHILA NANDA
Senior Attorney Advisor
OECA-OCE-WED
U.S. Environmental Protection Agency
Ariel Rios Building
12th Street and Pennsylvania Avenue, N.W.
Mail Code 2243A
Room 4111C
Washington, D.C.  20004

FOR THE STATE OF ILLINOIS:

PEOPLE OF THE STATE OF ILLINOIS,
ex rel. LISA MADIGAN, Attorney
General of the State of Illinois

MATTHEW J. DUNN, Chief
Environmental Enforcement/Asbestos
Litigation Division

s/Thomas H. Shepherd (with consent)
THOMAS H. SHEPHERD
Assistant Attorney General
Environmental Bureau
69 W. Washington Street, Suite 1800
Chicago, Illinois 60602
(312) 814-5361
tshepherd@atg.state.il.us